**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1471
_____

JOSEPH EGAN,

Appellant

v.

DELAWARE RIVER PORT AUTHORITY

_____

APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA
(D.C. No. 2:15-cv-03695)
District Judge: Hon. Timothy J. Savage
_____

Argued: January 12, 2017
_____

Before: SMITH, <u>Chief Judge</u>, JORDAN and SHWARTZ,
<u>Circuit Judges</u>.

(Filed: March 21, 2017)

Michael J. Salmanson, Esq. [ARGUED]
Scott B. Goldshaw, Esq.
Salmanson Goldshaw, P.C.
1500 John F. Kennedy Boulevard
Two Penn Center, Suite 1230
Philadelphia, PA 19102

      Counsel for Appellant

Rachel Goldberg, Esq. [ARGUED]
United States Department of Labor
Division of Fair Labor Standards
Room N2716
200 Constitution Avenue, N.W.
Washington, DC 20210

      Counsel for Amicus Appellant

Zachary R. Davis, Esq. [ARGUED]
Danielle M. Dwyer, Esq.
Stevens & Lee
1818 Market Street
29th Floor
Philadelphia, PA 19103

      Counsel for Appellee

_____

OPINION OF THE COURT
_____

SHWARTZ, <u>Circuit Judge</u>.

Plaintiff Joseph Egan brought suit against defendant Delaware River Port Authority, claiming that the Port Authority discriminated against him in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. (the "ADEA"), and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. (the "ADA"), and retaliated against him for exercising his right to take leave under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq. (the "FMLA"). A jury found that he was not the victim of discrimination or retaliation. Egan appeals, arguing that the District Court erred in: (a) refusing to give a mixed-motive jury instruction in connection with his FMLA claim; and (b) excluding testimony from one of Egan's co-workers.

To resolve this appeal, we must examine the regulation upon which Egan's FMLA retaliation claim is based and determine whether there is any requirement that a plaintiff introduce direct evidence of retaliation to pursue a mixed-motive theory of liability. As we will explain, the Department of Labor (the "DOL") acted within its authority to promulgate the regulation and the regulation's language permits a plaintiff to rely on such a theory so long as the evidence, whether direct or circumstantial, permits a reasonable juror to conclude that the plaintiff's use of FMLA leave was a negative factor in the employer's adverse employment decision. Because the District Court erred in requiring Egan to provide direct evidence of retaliation, we will vacate the FMLA verdict and remand on that claim.

As to Egan's ADA claim, because the Court acted within its discretion in excluding the testimony of Egan's co-

3

worker, it did not commit reversible error impacting those claims, and we will affirm the verdict in favor of the Port Authority on those counts.

I

Egan worked for the Port Authority from July 2008 until October 2012. He was hired as a Projects Manager for Special Projects. His primary responsibility was to manage fleet assets such as police vehicles, heavy equipment, and other vehicles. During his first two years of employment, only a small percentage of his work involved "economic development," which concerned the Port Authority's efforts to improve the communities in surrounding areas. App. 150-51. He did not perform any economic development work after 2010.

Egan reported to Deputy CEO Robert Gross until February 2012, when Michael Conallen replaced Gross. In March 2012, following a meeting with Conallen, Egan was transferred on special assignment to the Engineering Department and began reporting to Michael Venuto, the Port Authority's Chief Engineer. He was not given a new job description, and the duration of the assignment was not determined at that time.

Egan has suffered from migraine headaches since a 1995 accident. Egan testified that the frequency of his migraines increased "almost instantaneously" with his transfer to the Engineering Department, and he applied for FMLA leave in April 2012. App. 77. The Port Authority approved Egan's request for intermittent FMLA leave. An issue arose in July 2012 because Egan had been reporting

4

only the "approximate" number of hours he had worked, rather than the actual number of hours he had worked and took FMLA leave, and this discrepancy in Egan's reported hours "appear[ed] to be causing a hardship in his department." App. 612.

Evidence concerning this alleged "hardship" was adduced during discovery. The parties deposed one of Egan's Engineering Department co-workers, Mark Green. Green testified that he overheard a conversation between Egan and Venuto in which Venuto complained, in an "upset and angry" tone, about Egan's ability to complete tasks because of health issues. App. 611. Egan sought to elicit testimony about this conversation from Green at trial but the District Court precluded it because Green was not a participant in the conversation and heard only part of it while walking by Egan's office and, to permit it, would be misleading to the jury.

During trial, Egan did not recount such a conversation with Venuto. Instead, in response to the question, "Did [Venuto] ever say anything to you that indicated he was unhappy with the way you were using FMLA leave?", Egan testified:

> A. Well, on one occasion he came into my office and wanted me to—he was angry. He was upset. I was there working and he said in the future he wanted me when I left the premises to wave to his assistant as I was leaving, and that is somewhat unusual so—

Q. Did you feel that that suggested that he was unhappy with the way you were using FMLA leave?

A. I think there was a connection and that's speculation on my part, but I felt that way.

App. 108-09. Egan also confirmed the accuracy of the following deposition testimony:

Did [Venuto] ever say anything to you that indicated that he was not happy with your usage of FMLA leave?

Answer: No.

App. 109.

In August 2012, Venuto informed Conallen that he would not request positions for Egan and another employee. In addition, in October 2012, the Port Authority decided to eliminate its economic development positions. Thereafter, and while he was on FMLA leave, Egan was informed that all "economic development functions" were being eliminated, his "temporary reassignment" to the Engineering Department was "deemed completed," and he was terminated. App. 90.

Egan filed a complaint alleging violations of the ADEA, ADA, and FMLA. After discovery and motion practice, the case proceeded to trial. During the trial, the jury heard testimony from Egan, Venuto, and Green, among others. After the presentation of the evidence, the District Court resolved a dispute concerning the jury instructions. At the Court's request, the parties presented a joint set of instructions that included the Third Circuit Model Civil Jury

6

Instructions 10.1.3 and 10.1.2, respectively embodying the pretext and mixed-motive theories for proving discrimination.[1] The District Court denied Egan's request for a mixed-motive instruction for his FMLA retaliation claim, concluding that a mixed-motive instruction was not warranted because it should not be given in the FMLA context and, in any event, Egan had not presented direct evidence of retaliation.

---

[1] "Generally speaking, in a 'mixed-motive' case a plaintiff claims that an employment decision was based on both legitimate and illegitimate reasons. Such cases are in contrast to so-called 'pretext' cases, in which a plaintiff claims that an employer's stated justification for an employment decision is false." Connelly v. Lane Constr. Corp., 809 F.3d 780, 787 (3d Cir. 2016). Both theories have been used in FMLA cases in this Circuit. See, e.g., Budhun v. Reading Hosp. & Med. Ctr., 765 F.3d 245, 256-57 (3d Cir. 2014) (pretext theory); Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 301-02 (3d Cir. 2012) (mixed-motive theory). Under the FMLA regulation at issue in this case, a plaintiff pursuing a mixed-motive theory must show that exercise of FMLA rights was "a negative factor" in the employer's employment decision. 29 C.F.R. § 825.220(c). A plaintiff who proceeds to trial under a pretext theory must prove that a protected characteristic or the exercise of a protected right was a determinative factor and therefore had a determinative effect on the decision such that in the absence of the characteristic or protected conduct, the adverse employment action would not have occurred. See Miller v. CIGNA Corp., 47 F.3d 586, 597 (3d Cir. 1995) (en banc).

The jury returned a verdict for the Port Authority on all counts. Egan appeals, arguing that the District Court erred in denying his request for the mixed-motive instruction for his FMLA claim and, with respect to the ADA and FMLA claims, erred in precluding him from presenting Green's testimony about Egan and Venuto's conversation.

## II[2]

### A

We will first examine Egan's challenge to the District Court's ruling denying his request for a mixed-motive jury instruction in connection with his FMLA retaliation claim. When a party properly objects to a jury instruction, as here, "we exercise plenary review to determine whether the instruction misstated the applicable law." Franklin Prescriptions, Inc. v. N.Y. Times Co., 424 F.3d 336, 338 (3d Cir. 2005). In this case, this review entails determining whether the DOL properly exercised its authority to promulgate the regulation upon which Egan's retaliation claim is based, and, if so, whether it embodies a reasonable construction of the FMLA, including whether its inclusion of a mixed-motive approach to liability is permitted under Gross v. FBL Financial Services, Inc., 557 U.S. 167 (2009), and University of Texas Southwestern Medical Center v. Nassar, 133 S. Ct. 2517 (2013). If such a theory is permissible, then we must decide whether a plaintiff is required to present direct evidence to obtain a mixed-motive jury instruction.

---

[2] The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291.

1

Our Court has premised liability for FMLA retaliation claims on a DOL regulation, 29 C.F.R. § 825.220(c), which embodies the DOL's interpretation of the FMLA. Until now, however, we have not been required to examine whether the regulation embodies a permissible construction of the FMLA to which we must defer under Chevron v. Natural Resources Defense Council, 467 U.S. 837 (1984). To make this determination, we must answer two questions:

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

Id. at 842-43. The question of whether Congress has spoken on the question at issue is known as Chevron step one. If we

determine that Congress has not spoken on the precise issue, then we proceed to what is known as Chevron step two, where we examine whether the interpretation of the statute as embodied in the regulation is reasonable.

At Chevron step one, courts may "'employ [ ] traditional tools of statutory construction [to] ascertain[ ] that Congress had an intention on the precise question at issue.'" Zheng v. Gonzales, 422 F.3d 98, 112 (3d Cir. 2005) (quoting INS v. Cardoza-Fonseca, 480 U.S. 421, 448 (1987)). We "read the language in [the] broader context of the statute as a whole." Geisinger Cmty. Med. Ctr. v. Sec'y U.S. Dep't of Health & Human Servs., 794 F.3d 383, 391 (3d Cir. 2015). "If the statute's language is clear and unambiguous, we uphold the plain meaning of the statute." Cheruku v. Att'y Gen. of U.S., 662 F.3d 198, 202 (3d Cir. 2011).

We thus turn to the language of the FMLA to determine whether it provides precise guidance as to whether the FMLA protects an employee from retaliation. Under the FMLA, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter," including the right to seek or use FMLA leave. 29 U.S.C. § 2615(a)(1). The FMLA also makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." Id. § 2615(a)(2).

The statute does not specifically provide for a retaliation claim.[3]  In light of Congress's language and goals, however, we cannot say that this silence means that Congress did not intend to protect those who invoke their FMLA rights from retribution.  Congress chose words that broadly protect individuals who invoke their FMLA rights.  For instance, in § 2615(a)(1), Congress made it "unlawful for any employer to interfere with . . . the exercise of . . . any right provided" by the FMLA which includes the right to take up to "12 workweeks of leave during any twelve-month period" if the employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).  This right could be interfered with by, for example, prohibiting the individual

---

[3] Our Court has described, in general terms, § 2615(a)(1) as the "interference" provision and § 2615(a)(2) as the "retaliation" provision.  See Lichtenstein, 691 F.3d at 301; see also Hansler, 798 F.3d at 158 ("Retaliation claims arise out of the [FMLA's] prohibition on employers 'discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful'" (quoting 29 U.S.C. § 2615(a)(2) and citing § 825.220(c))).  The DOL, however, has concluded that retaliation flows from § 2615(a)(1).  73 Fed. Reg. 67,986 (Nov. 17, 2008) (stating that "[a]lthough section 2615(a)(2) of the Act also may be read to bar retaliation . . . , the Department believes that section 2615(a)(1) provides a clearer statutory basis for § 825.220(c)'s prohibition on discrimination and retaliation").  Since we are examining only the DOL's interpretation of the interference provision of § 2615(a)(1), we need not address § 2615(a)(2)'s prohibition of retaliation for "opposing any practice made unlawful" by the FMLA.

who has such a condition from being permitted to take such leave or by requiring the person to engage in significant work while on FMLA leave. Interference could also occur if an employee fears that he or she will be retaliated against for taking such leave. Thus, because the term "interfere with" is susceptible to multiple interpretations, and the statutory language does not directly address whether retaliation is among the actions an employer is prohibited from taking under the FMLA, Congress has not spoken on the "precise question" before us. Chevron, 467 U.S. at 842.

Therefore, we move to Chevron step two to determine whether the DOL's interpretation of § 2615 to include prohibiting retaliation "is based on a permissible construction of the statute" to which we are required to defer. Id. at 843. As the Chevron Court instructed, "legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Id. at 844. "A court may conclude that a regulation is arbitrary and capricious only if the agency relied on facts other than those intended by Congress, did not consider an important aspect of the issue confronting the agency, provided an explanation for its decision which runs counter to the evidence before the agency, or is entirely implausible." Gardner v. Grandolsky, 585 F.3d 786, 790 (3d Cir. 2009) (citation and internal quotation marks omitted). Although our "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one," and we are "not empowered to substitute [our] judgment for that of the agency." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971).

Congress empowered the DOL to "prescribe such regulations as are necessary to carry out" the FMLA. 29

12

U.S.C. § 2654. The DOL identified § 2615(a)(1) as the source of the prohibition against retaliation and promulgated a regulation that made retaliation for exercising FMLA rights unlawful. The regulation, 29 C.F.R. § 825.220(c), states that "[t]he Act's prohibition against interference prohibits an employer from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights," and further states that "employers cannot use the taking of FMLA leave as a negative factor in employment actions." 29 C.F.R. § 825.220(c).

We conclude that § 825.220(c) is a reasonable interpretation of § 2615(a)(1). The DOL's interpretation is consistent with the purposes of the FMLA, which include "entitl[ing] employees to take reasonable leave for medical reasons" without interference. 29 U.S.C. §§ 2601(b)(2), 2615(a)(1); Bachelder v. Am. W. Airlines, Inc., 259 F.3d 1112, 1119 (9th Cir. 2001) (discussing legislative history and stating, among other things, that "[t]he FMLA provides job security to employees who must be absent from work because of their own illnesses"). Indeed, "the established understanding at the time the FMLA was enacted was that employer actions that deter employees' participation in protected activities constitute 'interference' or 'restraint' with the employees' exercise of their rights," and "attaching negative consequences to the exercise of protected rights surely 'tends to chill' an employee's willingness to exercise those rights." Bachelder, 259 F.3d at 1124. To allow an employer to take an adverse employment action against an employee who takes FMLA leave would "undoubtedly run contrary to Congress's purpose in passing the FMLA." Bryant v. Dollar Gen. Corp., 538 F.3d 394, 401 (6th Cir.

2008). We agree with our colleagues in the Sixth and Ninth Circuits, as well as the Secretary of Labor, that "to permit employees to take leave from work for certain family and medical reasons and to return to the same or equivalent job at the conclusion of that leave" would be undermined if retaliation were not prohibited, Br. of Sec'y of Labor as Amicus Curiae in Support of Appellant 8-9. Thus, the regulation prohibiting retaliation for exercising FMLA rights is consistent with Congress's goal of enabling workers to address serious health issues without repercussion.

2

Having concluded that the regulation is a reasonable interpretation of the FMLA's interference provision, we must examine the DOL's decision to impose a requirement to consider the reason for the employer's action. We conclude that it is appropriate for the DOL to set forth in the regulation what constitutes retaliation, including this requirement for such a claim.

The regulation precludes an employer from placing negative weight on the use of FMLA leave when making an employment decision. As we explained in Lichtenstein v. University of Pittsburgh Medical Center, 691 F.3d 294 (3d Cir. 2012), under the regulation, "employers are barred from considering an employee's FMLA leave 'as a negative factor' in employment decisions," and that "an employee does not need to prove that invoking FMLA rights was the sole or most important factor upon which the employer acted." Id. at 301. Thus, under the regulation, an employee who claims retaliation and seeks to proceed under a mixed-motive approach must show that his or her use of FMLA leave was

14

"a negative factor" in the employer's adverse employment action.

Imposing this requirement makes sense, especially since a claim of retaliation includes an implication that the employer was motivated at least in part by the employee's use of FMLA leave. The interference provision of § 2615(a)(1) does not explicitly require a relationship between intent and outcome. See id. at 312. By including the "a negative factor" requirement, the DOL further addressed the gap left open by the statute's silence on the availability of a claim of retaliation and recognized that such a claim requires proof that the employer's motivation contributed to the adverse action. Thus, the DOL did not act arbitrarily in including such a requirement.

3

We next consider whether the selection of a requirement that a plaintiff show only that the use of FMLA leave was a negative factor in the employer's adverse job action, as opposed to the but-for cause of the action, is arbitrary or capricious. Congress has embraced both but-for and mixed-motive approaches in its anti-discrimination laws, and so long as there is a nonarbitrary basis for the DOL to select a mixed-motive approach, we are required to defer to the agency.

In the ADEA and in Title VII's anti-retaliation provision, Congress chose language that made clear that a plaintiff must prove "but-for" causation between the adverse employment action and the protected characteristic, in the case of the ADEA, and the protected act, in the case of Title

15

VII retaliation. In <u>Gross</u>, the Supreme Court observed that "[u]nlike Title VII['s anti-discrimination provision], the ADEA's text does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor." 557 U.S. at 174. The text of the ADEA provides that an employer may not "'fail or refuse to hire or . . . discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, <u>because of</u> such individual's age.'" <u>Id.</u> at 176 (quoting 29 U.S.C. § 623(a)(1) (emphasis in <u>Gross</u>)). The Court reasoned "the ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act," and a plaintiff must therefore prove that age was a "but-for" cause of the employer's adverse decision in order to establish a disparate-treatment claim. <u>Id.</u> at 176-77.

Similarly, in <u>Nassar</u>, the Supreme Court held that Title VII retaliation claims—where Title VII "makes it unlawful for an employer to take adverse employment action against an employee 'because' of certain criteria"—"require proof that the desire to retaliate was the but-for cause of the challenged employment action." 133 S. Ct. at 2528. Notably, the Court distinguished Title VII's anti-retaliation provision from its "principal" anti-discrimination provision, which states that a plaintiff establishes discrimination when he or she "demonstrates that race, color, religion, sex, or national origin was <u>a motivating factor</u>, for any employment practice, even though other factors also motivated the practice." <u>Id.</u> at 2526 (emphasis added) (quoting 42 U.S.C. § 2000e-2(m)). The anti-discrimination provision, with its "lessened causation standard," allows for a mixed-motive instruction. <u>See</u> <u>id.</u>

16

Thus, based on the statutory language, the Court recognized that different causation standards may apply to different claims.

The FMLA interference provision on which the regulation is based does not provide a causation standard and thus does not unambiguously require the use of "but-for" causation. See Chase v. U.S. Postal Serv., 149 F. Supp. 3d 195, 210 (D. Mass. 2016) (stating that "[t]he statute does not speak directly to standards for causation and provides no unambiguous indication that but-for causation is required" and concluding that § 825.220(c) is entitled to controlling Chevron deference), aff'd, 843 F.3d 553, 559 n.2 (1st Cir. 2016) (taking no position on Chevron deference or § 825.220(c)'s causation standard). Section 825.220(c) fills in that gap. Its text, which uses the phrase "a negative factor," resembles the "lessened causation standard" in § 2000e-2(m) and stands in contrast to the "because" language in the ADEA (at issue in Gross) and Title VII's anti-retaliation provision (at issue in Nassar).

We cannot say that choosing something other than "but-for" causation is unreasonable. As demonstrated above, Congress has endorsed the use of a lessened causation standard in Title VII's anti-discrimination provisions. Congress's choice reflects a view that consideration of any of the protected characteristics set forth in the statute, namely race, color, religion, sex, or national origin, is never permissible, even if it is not the sole reason for the employment decision. Similarly, in enacting the FMLA, Congress chose to ensure that those who need to address serious health issues may do so without interference. The regulation precludes an employer from considering the use of

such leave as a negative factor in an employment decision. Thus, like Title VII's anti-discrimination provision, it seeks to ensure that engaging in such protected activity does not negatively impact an employee. This choice is consistent with Congress's goals in enacting the FMLA and the sort of "legitimate policy choice[ ]" the agency is entitled to make. Chevron, 467 U.S. at 866; Chase, 149 F. Supp. 3d at 210 ("The relaxed causation standard provided by the [DOL] is precisely the sort of 'legitimate policy choice[ ]' that Chevron empowers a properly delegated agency to make." (quoting Chevron, 476 U.S. at 866) (alteration in Chase)). We cannot say this approach is arbitrary, and there is nothing to show that it is inconsistent with the teachings of Gross or Nassar. See Hunter v. Valley View Local Sch., 579 F.3d 688, 692 (6th Cir. 2009) (observing that "[t]he phrase 'a negative factor' envisions that the challenged employment decision might also rest on other, permissible factors," and thus "continu[ing] to find Price Waterhouse's burden-shifting framework applicable to FMLA retaliation claims" after Gross); see also Bachelder, 259 F.3d at 1122-25 (holding that § 825.220(c) "is a reasonable interpretation of the statute's prohibition on 'interference with' and 'restraint of' employee's rights under the FMLA [§ 2615(a)(1)]" and that "[t]he Labor Department's conclusion that employer use of 'the taking of FMLA leave as a negative factor in employment actions' . . . violates . . . the Act is . . . a reasonable one").

For these reasons, we hold that the DOL's use of a mixed-motive framework is not inconsistent with Nassar and Gross, and the regulation's mixed-motive approach is a permissible construction of the statute. Therefore, § 825.220(c) is entitled to controlling deference under

Chevron, and a mixed-motive jury instruction is available for FMLA retaliation claims.

4

Having concluded that a mixed-motive instruction is available for FMLA retaliation claims, the next question is the evidentiary threshold to obtain that instruction. As explained below, the Supreme Court has made clear that direct evidence is not required to proceed under a mixed-motive theory of liability.

In Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), the Supreme Court held that direct evidence is not required for a court to deliver a mixed-motive jury instruction for Title VII claims under § 2000e-2(m). Id. at 92, 101-02. Section 2000e-2(m) requires only that a plaintiff "'demonstrat[e]' that an employer used a forbidden consideration with respect to 'any employment practice,'" which "[o]n its face . . . does not mention, much less require, that a plaintiff make a heightened showing through direct evidence." Id. at 98-99 (quoting 42 U.S.C. § 2000e-2(m) (alteration in Desert Palace)). The Court observed that "Title VII's silence" regarding the type of evidence necessary in mixed-motive cases "also suggests that we should not depart from the "'[c]onventional rul[e] of civil litigation [that] generally appl[ies] in Title VII cases,'" which "requires a plaintiff to prove his case 'by a preponderance of the evidence,' . . . using 'direct or circumstantial evidence.'" Id. (quoting Price Waterhouse v. Hopkins, 490 U.S. 228, 253 (1989) (alterations in Desert Palace)).

We have followed Desert Palace within and outside of the Title VII context. See, e.g., Araujo v. N.J. Transit Rail

Operations, Inc., 708 F.3d 152, 161 (3d Cir. 2013) (citing Desert Palace and stating that direct evidence is not required for a retaliation claim under the Federal Rail Safety Act); Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008) (stating that Desert Palace held that a plaintiff need not present direct evidence in a mixed-motive Title VII discrimination case). In addition, the Courts of Appeals for the First, Seventh, Ninth, and Tenth Circuits have said that a plaintiff may establish an FMLA retaliation claim by either direct or circumstantial evidence. See Twigg v. Hawker Beechcraft Corp., 659 F.3d 987, 999-1000, 1004-05 (10th Cir. 2011); Lewis v. Sch. Dist. #70, 523 F.3d 730, 742 (7th Cir. 2008); Hillstrom v. Best W. TLC Hotel, 354 F.3d 27, 30-31 (1st Cir. 2003); Bachelder, 259 F.3d at 1125.

Like Title VII, the FMLA is silent concerning whether direct evidence is required to prove a claim. As a result, "we should not depart from the [c]onventional rule[s] of civil litigation," which allow a plaintiff to prove his claim using direct or circumstantial evidence. Desert Palace, 539 U.S. at 98-99 (citation and internal quotation marks omitted). Thus, we join our sister circuits in applying Desert Palace and holding that direct evidence is not required to obtain a mixed-motive instruction under the FMLA.

Here, the District Court denied Egan's request for a mixed-motive instruction, explaining that "there was no direct evidence which was the qualifying ground for submitting" a mixed-motive instruction to the jury. App. 509. As discussed above, after Desert Palace, Egan was not required to produce

direct evidence to receive a mixed-motive instruction.[4]  Thus, the District Court erred in requiring Egan to produce direct evidence of retaliatory motive to obtain the mixed-motive instruction.   Rather, in response to the request for the instruction, the Court should have determined whether there was evidence from which a reasonable jury could conclude that the Port Authority had legitimate and illegitimate reasons for its employment decision and that Egan's use of FMLA leave was a negative factor in the employment decision.[5]  We

---

[4] While Defendants pointed to a few of our cases as authority that direct evidence is required for mixed-motive instructions in FMLA retaliation claims even after <u>Desert Palace</u>, we have not held as much because that issue was never outcome-determinative until this case.  <u>See</u> <u>Ross v. Gilhuly</u>, 755 F.3d 185, 193 (3d Cir. 2014) (noting that the plaintiff did "not argue that his retaliation claims are mixed-motive claims"); <u>Lichtenstein</u>, 691 F.3d at 302 (holding that whether the case could proceed under a mixed-motive instruction was not relevant because the case could proceed under "the more taxing <u>McDonnell Douglas</u> standard"); <u>Conoshenti v. Pub. Serv. Elec. & Gas Co.</u>, 364 F.3d 136, 147 (3d Cir. 2004) (noting that the defendant did not contest that the plaintiff supplied direct evidence).

[5] The Port Authority argues that this error in the jury instruction was harmless because the jury quickly returned a verdict finding that Egan's use of FMLA leave was not the motivating factor for his termination.  A jury instruction error "is not harmless if it could have 'reasonably . . . affected the outcome of the trial' or if the jury 'quite possibly' relied on an erroneous instruction.'" <u>Avaya Inc., RP v. Telecom Labs, Inc.</u>, 838 F.3d 354, 396 (3d Cir. 2016) (quoting <u>Hill v. Reederei F. Laeisz G.M.B.H., Rostock</u>, 435 F.3d 404, 411 (3d

will therefore vacate the FMLA judgment entered in favor of the Port Authority and remand.

B

We next examine Egan's assertion that the District Court abused its discretion by precluding Green's testimony pursuant to Federal Rule of Evidence 403. We review a district court's Rule 403 ruling for abuse of discretion, United States v. Vosburgh, 602 F.3d 512, 537 (3d Cir. 2010), and reverse only if the error was not harmless.

"A district court has broad discretion to determine the admissibility of relevant evidence in response to an objection under Rule 403." Id. (citation and internal quotation marks omitted). Under Rule 403, "the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The Rule 403 inquiry is inexact,

---

Cir. 2006), and Hirst v. Inverness Hotel Corp., 544 F.3d 221, 228 (3d Cir. 2008)). Here, the difference between "but-for" and "mixed-motive" instruction goes to the central issue before jury: Why was Egan fired? There is no question that a significant change relating to this critical issue could have reasonably affected the outcome of the trial. See Gross v. FBL Fin. Servs., Inc., 588 F.3d 614, 617 (8th Cir. 2009) (holding that the improper use of a "mixed-motive" instruction in a "but-for" case "shifted the burden of persuasion on a central issue in the case," and therefore "the error cannot be harmless").

"requiring sensitivity on the part of the trial court to the subtleties of the particular situation, and considerable deference on the part of the reviewing court to the hands-on judgment of the trial judge." Vosburgh, 602 F.3d at 537 (citation and internal quotation marks omitted). Thus, "[w]e will not disturb the District Court's ruling unless it was arbitrary or irrational." Id. (citation and internal quotation marks omitted). If a trial court fails to articulate its balance between the probative value and the prejudicial effect of evidence, we either "decide the trial court implicitly performed the required balance; or, if we decide the trial court did not, we undertake to perform the balance ourself." United States v. Eufrasio, 935 F.2d 553, 572 (3d Cir. 1991).

If we conclude it was error to exclude or admit a piece of evidence, then we review the ruling to determine if the exclusion or admission of the evidence was harmless. Under the harmless error standard, the erroneous exclusion or admission of evidence will not require reversal "if it is highly probable that the error did not contribute to the judgment." United States v. Cross, 308 F.3d 308, 326 (3d Cir. 2002) (citation and internal quotation marks omitted).

Here, the District Court sustained the Port Authority's objection to Green's testimony about a conversation between Venuto and Egan that he overheard. The following occurred during Green's direct examination:

> Q. Did you ever hear Mr.—did you ever observe Mr. Egan and Mr. Venuto in Mr. Egan's office?
> A. Yes.
> Q. And what did you observe?

23

Mr. Davis [Port Authority's counsel]: Objection, Your Honor.

The Court: Sustained.

. . .

Q. When you observed them in their office, were you—were they having a conversation?

A. Yes.

Q. And were you able to hear the conversation?

A. Yes.

Q. Can you please describe the conversation that Mr. Egan—

The Court: were you present in the room?

The Witness: No, Sir.

The Court: But you could hear the conversation?

A. Yes.

. . .

Q. Where were you standing for this conversation?

A. I was walking down a corridor towards Mr. Egan's office—actually, past Mr. Egan's office, and I heard the conversation that way.

Mr. Davis: Objection, Your Honor.

The Court: Did you continue walking?

The Witness: Yes.

The Court: You didn't stop to listen?

The Witness: No.

The Court: So you were able to hear this as you're walking, the whole conversation?

The Witness: Not the whole conversation but a great deal. They were pretty loud.

Mr. Davis: Objection, Your Honor.

The Court: Sustained.

Mr. Salmanson [Egan's counsel]: What's the basis for the objection?

The Court: He didn't hear the entire conversation.

Mr. Salmanson: And could he relay the part of the conversation he did hear?

The Court: No, because it would be incomplete and misleading.

Mr. Salmanson: I have nothing further, Your Honor.

App. 170-72. The transcript shows that the District Court did not explicitly conduct a balancing inquiry under Rule 403, but it did identify one 403 consideration, that admission of only a part of the conversation could be misleading. While we strongly prefer that the District Court explain how it balanced the Rule 403 considerations, we will perform the balancing analysis ourselves to determine whether the District Court abused its discretion. See Eufrasio, 935 F.2d at 572.

First, we examine the probative value of the proposed testimony. Green's testimony, as shown in his deposition and the District Court's summary judgment order, was probative of the Port Authority's motivation in terminating Egan. Green testified in his deposition that he heard Egan and Venuto "having an exchange" when he was walking by Egan's office. App. 610. He explained that:

[W]hat I could hear was Mr. Egan telling Mr. Venuto that he couldn't commit to a certain task because of his underlying health issues. He wasn't sure if he could commit to the deadline. And I overheard Mr. Venuto yelling, what can

25

you do, Joe, what can you do. And at that time
I turned around and went back to my office. I
didn't want to be involved in that exchange.

App. 610. He also stated that Venuto "seemed pretty animated and pretty upset and angry." App. 611. The District Court noted the potential probative value of this testimony in its order denying the Port Authority's motion for summary judgment, where it noted that "[r]emarks made by Michael Venuto . . . may give rise to an inference of discriminatory animus as to Egan's age, disability, and FMLA status" because "Green[ ] testified that Venuto voiced concerns over Egan's ability to complete assignments due to his being out of work for health reasons." App. 613-14. Thus, even the District Court recognized that Green's testimony about the conversation he overheard was probative of the Port Authority's alleged discriminatory animus.

Having concluded that the evidence has probative value, we turn to the second part of the inquiry, namely whether the value is substantially outweighed by considerations in Rule 403 such as prejudice or misleading the jury. Despite the testimony's probative value, the District Court did not abuse its discretion in precluding the testimony at trial. By the time Green's testimony was offered, the District Court had heard Egan's testimony. Egan did not recount a conversation like the one Green said he partially overheard. In addition, the District Court heard no testimony from Venuto about such a conversation. Thus, the District Court was presented with a situation where neither participant in the conversation that Green partially overheard testified about it. Given the great deference we pay to district courts' Rule 403 rulings, even if we may have reached a different

ruling,[6] we cannot say the Court here abused its discretion by precluding Green's testimony, and we will not disturb the verdicts on any of the claims on this basis.[7]

IV

For the foregoing reasons, we will affirm in part and vacate and remand in part.

---

[6] Arguably, the District Court could have properly exercised its discretion and permitted the testimony given that: (1) the parties could have cross-examined Green about what he was able to hear; (2) participants in the conversation testified and could have been questioned about it; and (3) the jury could have given whatever weight it deemed warranted to the testimony from a witness who heard only part of a conversation. Cf. United States v. Mathis, 264 F.3d 321, 327-28 (3d Cir. 2001)  (finding no abuse of discretion for admitting testimony when the court instructed the jury on the permissible uses of that testimony and the testimony "was properly challengeable, and was in fact challenged, by vigorous cross-examination").

[7] Because our ruling is based upon the trial record presented on this appeal, we render no opinion about the admissibility of the testimony at a subsequent trial if the evidence presented satisfies the District Court that its probative value is not substantially outweighed by Rule 403 considerations.

JORDAN, *Circuit Judge*, concurring in the judgment.

In our ruling today, we are required to defer to the Department of Labor's interpretation of the FMLA. While I concur in the judgment, I write separately to note my discomfort with our reasoning, which is dictated by the regimes of deference adopted by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and *Auer v. Robbins*, 519 U.S. 452 (1997). The doctrine of deference deserves another look. *Chevron* and *Auer* and their like are, with all respect, contrary to the roles assigned to the separate branches of government; they embed perverse incentives in the operations of government; they spread the spores of the ever-expanding administrative state; they require us at times to lay aside fairness and our own best judgment and instead bow to the nation's most powerful litigant, the government, for no reason other than that it is the government. The problems they create are serious and ought to be fixed.

Our nation's founders embraced the idea that freedom is best secured by dividing governmental power into distinct, structurally separate components. James Madison famously wrote that "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands … may justly be pronounced the very definition of tyranny." The Federalist No. 47; *see also* Rebecca L. Brown, *Separated Powers and Ordered Liberty*, 139 U. Pa. L. Rev. 1513, 1538 (1991) (noting that the constitutions of five states, including Virginia and Massachusetts, expressly separated governmental power in ways similar to the United States Constitution). The Revolutionary generation had learned by hard experience "that abandonment of separated powers led directly to the loss

of accountable, impartial government, which, in turn, led inevitably to the loss of due process and individual rights." Brown, *supra* at 1538; *see also* Martin H. Redish & Elizabeth J. Cisar, *"If Angels Were to Govern": The Need for Pragmatic Formalism in Separation of Powers Theory*, 41 Duke L.J. 449, 476 (1991) (observing that formal separation of powers is a prophylactic measure intended to prevent one branch's accumulation and concentration of powers). Our Constitution was thus framed specifically to avoid the concentration of powers in the hands of a single branch of government. *Chevron*, however, has dramatically undermined that purpose.

Each branch of government was meant to act as a check on the other so that power is not exercised without accountability. *See Perez v. Mortg. Bankers Ass'n*, __ U.S. __, 135 S. Ct. 1199, 1216 (2015) (Thomas, J., concurring) ("To the Framers, the separation of powers and checks and balances were more than just theories. They were practical and real protections for individual liberty in the new Constitution."). The checking function of the courts is in our power of judicial review, it being "emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). Yet, the Supreme Court has created a doctrine that requires judges to ignore their own best judgment on how to construe a statute, if the executive branch shows up in court with any "reasonable interpretation made by the administrator of an agency." *Chevron*, 467 U.S. at 844.

As though that were not bad enough, our hands are also tied when an agency interprets or reinterprets its own rules. Those fetters were put in place by *Auer v. Robbins*,

2

which extended judicial deference to an agency's interpretation of its rules, even in the midst of litigation. 519 U.S. at 462 (1997). The result today is that agencies are entitled to deference for their interpretation of statutes and then to a further dose of deference for their interpretation of the rules and regulations they layer on top of those statutes.[1] All the while, federal courts are pushed further and further away from our constitutional responsibility to "say what the law is." [2] *Marbury*, 5 U.S. at 177; *see also Decker v. Nw.*

_____

[1] Agencies can also play a large role in the drafting and vetting of legislation, even before it is enacted, so they will at times have three bites at the law-making apple. *See* Christopher J. Walker, *Legislating in the Shadows*, 165 U. Pa. L. Rev. (forthcoming 2017), *available at* https://ssrn.com/abstract=2826146 (presenting the results of extensive interviews and surveys with twenty federal agencies).

[2] Several states have expressly rejected the *Chevron* framework and their courts have refused to defer to state agency interpretations of state law. *See, e.g.*, *Hughes Gen. Contractors, Inc. v. Utah Labor Comm'n*, 322 P.3d 712, 717-18 (Utah 2014) ("openly repudiat[ing]" *Chevron* deference to agencies and "retain[ing] for the courts the *de novo* prerogative of interpreting the law, unencumbered by any standard of agency deference"); *In re Complaint of Rovas Against SBC Mich.*, 754 N.W.2d 259, 272 (Mich. 2008) ("[T]he unyielding deference to agency statutory construction required by *Chevron* conflicts with … separation of powers principles … by compelling delegation of the judiciary's constitutional authority to construe statutes to another branch of government."); *Pub. Water Supply Co. v. DiPasquale,* 735

*Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1341 (2013) (Scalia, J., concurring) (arguing that *Auer* deference "violate[s] a fundamental principle of separation of powers—that the power to write a law and the power to interpret it cannot rest in the same hands"). *Chevron* and the cases that have followed and expanded on it, including *Auer*, thus "undermine[] our obligation to provide a judicial check on the other branches, and … subject[] regulated parties to precisely the abuses that the Framers sought to prevent." *Perez*, 135 S. Ct. at 1213 (Thomas, J., concurring).

The deference required by *Chevron* not only erodes the role of the judiciary, it also diminishes the role of Congress. Under *Chevron*, "[s]tatutory ambiguity … becomes an implicit delegation of rule-making authority, and that authority is used not to find the best meaning of the text, but to formulate legally binding rules to fill in gaps based on policy judgments made by the agency rather than Congress." *Michigan v. Envtl. Prot. Agency*, __ U.S. __, 135 S. Ct. 2699, 2713 (2015) (Thomas, J., concurring). And we in the courts have abetted that process, largely "abdicat[ing] our duty to enforce [the] prohibition" against Congressional delegation of legislative power to executive agencies. *Dep't of Transp. v. Ass'n of Am. R.R.*, __ U.S. __, 135 S. Ct. 1225, 1246 (2015) (Thomas J., concurring). The consequent aggrandizement of federal executive power at the expense of the legislature leads to perverse incentives, as Congress is encouraged to pass vague laws and leave it to agencies to fill in the gaps, rather

---

A.2d 378, 382 (Del. 1999) ("Statutory interpretation is ultimately the responsibility of the courts.").

than undertaking the difficult work of reaching consensus on divisive issues.[3]

*Auer* deference further accentuates the shift of power to the executive branch by encouraging agencies to promulgate regulations vague enough to allow administrators wide latitude in deciding how to govern. *See Perez*, 135 S. Ct. at 1212 (Scalia, J., concurring) (critiquing *Auer* deference because it encourages agencies to "write substantive rules more broadly and vaguely, leaving plenty of gaps to be filled in later, using interpretive rules unchecked by notice and comment" rulemaking). And govern they do, not merely by enforcing laws passed by the people's representatives, but through their own vast and largely unaccountable power. It is, in fact, a growing power. Deference to agencies strengthens the executive branch not only in a particular dispute under judicial review; it tends to the permanent expansion of the administrative state. Even if some in Congress want to rein an agency in, doing so is very difficult

---

[3] As well stated by Representative Bob Goodlatte, Chairman of the House Committee on the Judiciary, *Chevron* deference "tempts Congress to let the hardest work of legislating bleed out of Congress and into the Executive Branch, since Congress knows judges will defer to agency interpretations of ambiguities and gaps in statutes Congress did not truly finish." *The Chevron Doctrine: Constitutional and Statutory Questions in Judicial Deference to Agencies*: *Hearing before the H. Subcomm. on Regulatory Reform, Commercial and Antitrust Law of the Committee on the Judiciary*, 114th Cong. (March 15, 2016) (Prepared Statement of the Honorable Bob Goodlatte).

because of judicial deference to agency action. Moreover, the Constitutional requirements of bicameralism and presentment (along with the President's veto power), which were intended as a brake on the federal government, being "designed to protect the liberties of the people," are instead, because of *Chevron*, "veto gates" that make any legislative effort to curtail agency overreach a daunting task. Randy R. Barnett, *Our Republican Constitution: Securing the Liberty and Sovereignty of We the People*, 212 (2016).

In short, *Chevron* "permit[s] executive bureaucracies to swallow huge amounts of core judicial and legislative power and concentrate federal power in a way that seems more than a little difficult to square with the Constitution of the [F]ramers' design." *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1149 (10th Cir. 2016) (Gorsuch, J., concurring). That deterioration in the separation of powers is not merely a matter of abstract concern over political theory. The point of structural separation is, again, the protection of individual liberty. *See NLRB v. Noel Canning*, __ U.S. __, 134 S. Ct. 2550, 2559 (2014) ("We recognize, of course, that the separation of powers can serve to safeguard individual liberty[.]"). "The doctrine of the separation of powers was adopted by the Convention of 1787 not to promote efficiency but to preclude the exercise of arbitrary power." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 629 (1952) (Douglas, J., concurring) (quoting *Myers v. United States*, 272 U.S. 52, 293 (1926) (Brandeis, J., dissenting)).

When the power to create and interpret and enforce the law is vested in a single branch of government, the risk of arbitrary conduct is high and individual liberty is in jeopardy. An agency can change its statutory interpretation with

minimal justification and still be entitled to full deference from Article III courts. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) ("Agency inconsistency is not a basis for declining to analyze the agency's interpretation under the *Chevron* framework."). Citizens are therefore left to the mercy of government functionaries who are free "to bend existing laws, to reinterpret and apply them retroactively in novel ways and without advance notice." *Gutierrez-Brizuela*, 834 F.3d at 1149 (Gorsuch, J., concurring). We would never allow a private litigant the power to authoritatively reinterpret the rules applicable to a dispute, yet we routinely allow the nation's most prolific and powerful litigant, the government, to do exactly that.[4] Agencies can make the ground rules and change them in the middle of the game.[5]

---

[4] The authority that agencies have to create binding law and reinterpret it at will may be heard as an echo of the royal prerogative to issue proclamations and interpret laws, a power claimed by British monarchs and widely rejected by Parliament and common law judges during the latter half of the 17th century. *See* Philip Hamburger, *Is Administrative Law Unlawful?*, 33-63 (2014).

[5] The Supreme Court has declared that deference is inappropriate when an agency's reinterpretation of its regulation is "nothing more than a 'convenient litigating position' … a 'post hoc rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack," or would result in "unfair surprise." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 132 S. Ct. 2156, 2167-68 (2012) (citations omitted) (second alteration in original). In practice, however, deference is granted even to

7

I am not arguing that there is no role in our system of government for deference to administrative agencies. They unquestionably have institutional expertise that allows them to understand some provisions of law "based upon more specialized experience and broader investigations and information than is likely to come to a judge in a particular case." *Skidmore v. Swift & Co.*, 323 U.S. 134, 139 (1944). Such expertise may give agencies and the courts assistance when confronting technical issues. So, for instance, the Federal Energy Regulatory Commission is well qualified to determine what is the "just and reasonable" rate that utilities should pay when purchasing energy from other energy-producing facilities. *Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 415 (1983). Likewise, the Treasury Department is in a good position to say whether certain revenue qualifies as "reserve strengthening." *Atl. Mut. Ins. Co. v. C.I.R.*, 523 U.S. 382, 389-91 (1998). And the Department of Energy can helpfully suggest whether "oil produced from tar sands" includes oil produced using enhanced extraction techniques. *Shell Petroleum, Inc. v.*

---

an agency's poorly reasoned post-hoc rationalizations. *See Columbia Gas Transmission, LLC v. 1.01 Acres, More or Less in Penn Twp., York Cty., Pa., Located on Tax ID #440002800150000000 Owned by Brown*, 768 F.3d 300, 316 (3d Cir. 2014) (Jordan J., dissenting) (critiquing the majority opinion for accepting an agency's regulatory interpretation that the agency itself had once acknowledged was "at odds with … the common understanding" of the terms of the regulation and that was adopted in a footnote "in the middle of an unrelated rulemaking" as a "reaction to the District Court's decision in [that] case").

*United States*, 182 F.3d 212, 217 (3d Cir. 1999). But Supreme Court precedent before *Chevron* already granted the "rulings, interpretations and opinions" of agencies a level of deference consistent with "the thoroughness evident in [the particular decision under] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Skidmore*, 323 U.S. at 140. That level of deference appropriately takes into account an agency's specialized knowledge while retaining for the judiciary the prerogative "to say what the law is." *Marbury*, 5 U.S. at 177.

Highly specialized or technical matters are far different, however, than the legal matters on which federal courts are now routinely told, in the name of *Chevron*, to bow down and obey the executive branch. The facts of this case illustrate the problem. The Department of Labor is entitled to tell us where, in a vaguely worded portion of the Family and Medical Leave Act (FMLA), we are to look for a prohibition on retaliation against employees who take FMLA leave. Consequently, even though we determined years ago that retaliation claims arise under 29 U.S.C. § 2615(a)(2), *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 146 n.9 (3d Cir. 2004), we must now defer to the Department of Labor's final rule concluding otherwise.[6] Then, after

---

[6] Even the Department of Labor recognized that "section 2615(a)(2) of the Act also may be read to bar retaliation[.]" Dep't of Labor Rules and Regulations for the Family Medical Leave Act of 1993, 73 Fed. Reg. 67934-01 (Nov. 17, 2008) (to be codified at 29 C.F.R. pt. 825). But, because the Department "believe[d] that section 2615(a)(1) provides a clearer statutory basis for § 825.220(c)'s

deferring to the Department's decision about which provision of the statute we are supposed to interpret, we must again defer to the Department when it delineates the rules of proof regarding such a claim and the kind of jury instruction that must be given.[7]  So much for the job of the judicial branch.

Were we free to actually interpret the law rather than merely defer to an executive agency, we might well conclude that the FMLA does not allow for a mixed-motive instruction for Egan's retaliation claim.  "Causation in fact – *i.e.,* proof that the defendant's conduct did in fact cause the plaintiff's injury – is a standard requirement of any tort claim." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, __ U.S. __, 133 S. Ct. 2517, 2524 (2013).  Therefore, "[a]bsent some reason to believe that Congress intended otherwise," *Gross v. FBL Fin. Servs. Inc.*, 557 U.S. 167, 177 (2009), an employee must prove that a "prohibited criterion was the but-for cause of [an employer's] prohibited conduct." *Nassar*, 133 S. Ct. at 2523.  While the terms of the FMLA do not expressly foreclose a mixed-motive instruction, *cf. Gross*, 557 U.S. at 176 (emphasizing that the prohibition in the ADEA against discrimination "because of" an impermissible consideration was synonymous with a requirement of "but for" causation and foreclosed a mixed-motive instruction), neither do they mandate or even encourage such an instruction, *cf. Nassar*,

---

prohibition of discrimination and retaliation[,]" we are obligated to defer to that belief and limit our examination to § 2615(a)(1).

[7] The differences between "mixed motive" and "pretext" employment discrimination cases are ably described in the majority opinion.  (Maj. Op. at 7 n.1.)

10

133 S. Ct. at 2534 (emphasizing that the prohibition in Title VII against retaliation when an impermissible characteristic was a "motivating factor" clearly permitted a mixed- motive instruction). Therefore, the default standard of "but for" causation seems to be applicable and a mixed-motive instruction would seem out of order.[8] Nevertheless, because the Department of Labor has interpreted the statute

---

[8] Neither Section 2615(a)(1) nor (a)(2) contains causation language akin to either the "because of" language of the ADEA or the "motivating factor" language of Title VII. 29 U.S.C. §§ 2615(a)(1)-(2). Section 2615(a)(2) prohibits discrimination against an individual "for opposing any practice made unlawful by this subchapter." *Id.* at § 2615(a)(2). A subsequent section, 2615(b), prohibits discharging someone "because such [an] individual" filed charges, gave information in an inquiry, or testified in a proceeding related to the rights protected by the FMLA – language closer to that found in the ADEA. *Id.* at § 2615(b). The best reading of Section 2615(a)(2) might thus involve reading the "for opposing" language in harmony with the "because" language from the subsequent section to conclude that "but for" causation is required. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 121 (2000) (noting that courts "must place [statutory] provision[s] in context, interpreting the statute to create a symmetrical and coherent regulatory scheme"). Regardless, there is no language akin to "motivating factor" indicating that something less than "but for" causation is in order and so the default rule laid out in *Gross* and *Nassar* indicates that a mixed-motive instruction is not warranted.

differently, we are obliged to fall in line and adopt a standard for FMLA claims that Congress has never embraced.

The consequences of this particular distortion of government functioning are foreseeable. As the Supreme Court noted in *Nassar*, "claims of retaliation are being made with ever-increasing frequency" and "lessening the causation standard could … contribute to the filing of frivolous claims, which would siphon resources from efforts by employer[s], administrative agencies, and courts to combat workplace harassment." 133 S. Ct. at 2531-32. Allowing claims to go forward on the terms dictated by the Department of Labor is a shift in public policy that should be debated and crafted within the legislative branch rather than being announced by unelected officials in an administrative agency. Yet, based on the judgment of someone inside the Department tasked with enforcing the FMLA, and despite the District Court's effort to say what the law is, employers will now face a lower threshold of liability than they would have under the default causation standard. It is worth pondering how we arrived at this point.[9] The trajectory is more important than the result in this particular case.

---

[9] Some elected officials are taking note. Recently, Congress considered restoring full judicial review of agency action. On January 12, 2017, the House of Representatives passed The Regulatory Accountability Act of 2017, which, if passed by the Senate and signed into law, would prevent courts from deferring to certain agency determinations and instead require review of those determinations for "abuse of agency discretion." H.R. 5, 115th Cong. § 107(c)-(d) (2017) (proposing amendments to 5 U.S.C. § 706).