**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-2775
_____

UNITED STATES OF AMERICA

v.

DONNA FALLON,
               Appellant
_____

No. 19-2788
_____

UNITED STATES OF AMERICA

v.

DEAN VOLKES,
               Appellant
_____

No. 19-2792
_____

UNITED STATES OF AMERICA

v.

DEVOS LTD LLC d/b/a GUARANTEED RETURNS,
                                          Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court Nos. 2-14-cr-00574-003, 2-14-cr-00574-002,
& 2-14-cr-00574-001)
District Judge:  Petrese B. Tucker
_____

Argued:  March 16, 2021
_____

Before: KRAUSE, PHIPPS, and FUENTES, *Circuit Judges*.

(Filed: September 30, 2022)

Robert J. Cleary **[ARGUED]**
William C. Komaroff
James R. Anderson
Proskauer Rose LLP
11 Times Square
New York, NY 10036

  *Counsel for Appellant Donna Fallon*

Lisa A. Mathewson **[ARGUED]**
The Law Offices of Lisa A. Mathewson, LLC
123 S. Broad Street, Suite 810
Philadelphia, PA 19109

*Counsel for Appellant Dean Volkes*

Douglas E. Grover
Richard H. Dolan  **[ARGUED]**
Thomas A. Kissane
Schlam Stone & Dolan LLP
26 Broadway
New York, NY 10004

*Counsel for Appellant DEVOS, LTD*

William M. McSwain
Robert A. Zauzmer
Patrick J. Murray
Elizabeth M. Ray
Nancy Rue **[ARGUED]**
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

*Counsel for Appellee United States of America*

_____

OPINION OF THE COURT
_____

FUENTES, *Circuit Judge*.

The three Appellants—Devos LTD LLC, which trades under the name "Guaranteed Returns"; Dean Volkes, the company's owner and Chief Executive Officer; and Donna Fallon, the company's Chief Financial Officer and Volkes's sister—appeal their convictions arising from multiple schemes to defraud their clients, including the United States

3

Government.  For the reasons explained herein, we will vacate Appellants' conviction for conspiracy to launder money, vacate the sentences, and remand for resentencing, including a recalculation of the forfeiture award.  For all other convictions, we will affirm.

## I.    Background

### A.    Factual Background

Guaranteed Returns was a "reverse distributor" of pharmaceutical products.  It provided inventory management services to healthcare providers (such as hospitals, pharmacies, long-term care facilities, and doctors' offices) by returning unused or expired pharmaceutical drugs to the drug manufacturers, for which the provider can normally receive a refund.  Because healthcare providers need multiple pharmaceuticals from a variety of manufacturers, each with different return policies for their products, reverse distributors perform this service for their clients in exchange for a fee, which is typically a percentage of the return value of the drugs.

To obtain a refund, the provider must either physically return the pharmaceutical to the manufacturer, or certify that it has been destroyed.  The manufacturer then issues the refund, either in the form of a credit to the healthcare provider's account at the relevant wholesaler,[1] or as a money refund by a wire transfer or check.  Reverse distributors like Guaranteed

---

[1] Most healthcare providers purchase their pharmaceutical products through wholesale distributors rather than through individual manufacturers.  A healthcare provider therefore may have an account with a wholesaler of a drug, not with the manufacturer of the drug.

4

Returns manage this process for their clients: a provider sends its pharmaceuticals to the reverse distributor who returns the drugs on the provider's behalf. As a consequence, both the drugs and the funds that reverse distributors receive from manufacturers for returning those drugs are the property of the healthcare-provider clients.

Providers will also send non-returnable pharmaceuticals to reverse distributors. These include unexpired pharmaceuticals that the providers no longer need but that may become eligible for a refund upon expiration. These are commonly known as "indates."[2] Reverse distributors can keep track of these indates, "age" them until they are returnable, and then submit them for a refund when the time comes.

To run their operations efficiently, reverse distributors return all pharmaceuticals eligible for a refund to a single manufacturer in one "batch." These batches can be comprised of different drugs submitted on behalf of different healthcare providers. The manufacturer, in accordance with its policy, will then either credit the individual healthcare provider's account at the relevant wholesaler, or remit a lump-sum payment to the reverse distributor who then issues refunds—less a service fee—to its healthcare-provider clients whose drugs were in the batch. For Guaranteed Returns, the lump-sum refunds were wired directly to the company's general operating account, and the company then issued refund checks from that account to the relevant clients, less a service fee.[3]

---

[2] These products are still "in date," meaning that they are not yet expired.

[3] The operating account was used to receive and distribute money relating to the operation of the business, including to make vendor payments and to pay operating expenses such as

Guaranteed Returns used a database management software called FilePro to track the information necessary to determine how much money to remit to which clients from the lump-sum refunds. Each healthcare-provider client had a separate account in FilePro. This software tracked the pharmaceuticals received, to which client they belonged, the date they arrived, and the date of return, among other information. For indates, FilePro also tracked the date on which these pharmaceuticals would become eligible for a refund.

In 2001, the Government started doing business with Guaranteed Returns. The Department of Defense ("DoD") contracted with Guaranteed Returns to handle pharmaceutical returns for a number of government facilities. DoD and Guaranteed Returns entered into another agreement in 2007. Guaranteed Returns's proposal for the second contract specifically stated that it would inventory, warehouse, and age the Government's indates, and then return the indates when eligible, for its usual fee. Guaranteed Returns's 2001 contract did not refer to indates by name, but the company specifically included indates in the 2007 contract. The company also required its clients to use a return authorization form when sending drugs for credit that purported to give Guaranteed Returns wide discretion concerning pharmaceuticals that were not "immediately creditable."[4]

---

freight, payroll, and expenses related to the company's facilities.

[4] App. 6101–02 ("Guaranteed Returns reserves the right, in its sole discretion, to dispose, remit, donate and/or otherwise receive product that it believes not to be in an immediately creditable state without claim for remuneration.").

The Government began investigating Guaranteed Returns after the District of Columbia noticed that it did not receive the full refund on a return of some of its pharmaceuticals.[5] The Defense Criminal Investigative Service investigated, and the Government eventually uncovered a series of schemes that Guaranteed Returns used to defraud its clients. Four such schemes are described below.

### 1. The Indates Scheme

Volkes devised and implemented a scheme to return indated drugs to manufacturers on Guaranteed Returns's own behalf—not on behalf of the client who owned the drugs—and to keep the refund money. To do this, in 2007, Volkes instructed his IT staff to change the programming in FilePro to divide each of Guaranteed Returns's clients into two categories: "managed" and "unmanaged." "Managed" clients were thought to pay close attention to whether they received refunds or credits for indates, while "unmanaged" clients were thought not to do so. The computer program diverted indates from unmanaged clients by reclassifying them as the property of Guaranteed Returns, listing them in FilePro as the property of a non-existent client labeled "GRX Stores." The program did not affect the indates for "managed" clients. When Guaranteed Returns received the lump-sum payment from manufacturers for returning a batch of pharmaceuticals, it would pay "managed" clients the amount owed but kept for itself the amount that should be owed to "unmanaged" clients for the indate refunds. To ensure that the scheme was not uncovered, when submitting batches of pharmaceuticals to

---

[5] The return in question was for $600,000 worth of recently expired Cipro, which the District of Columbia had stockpiled for availability in case of an anthrax attack.

manufacturers for refunds, Guaranteed Returns attributed each drug to the healthcare provider from whom Guaranteed Returns had diverted the drug.

### 2.     The G-13 Scheme

Volkes also devised a scheme to divert indates from managed clients.  In late 2010, he instructed his IT staff to reclassify every thirteenth expiring indate product of a managed client as the property of GRX Stores, if the value of the product was less than $3,000.  Volkes wanted to avoid stealing products that were so valuable that they might catch the client's attention.

### 3.     The Three-Year Cutoff Scheme

In 2011, Volkes developed another scheme to divert indates from managed clients.  Volkes instructed his IT staff to reclassify indates that were received more than three years earlier as the property of the GRX Stores.

### 4.     Adjustment Scheme

Not all of Guaranteed Returns and Volkes's schemes involved indates.  In fall 2010, Volkes directed his IT staff to create a program that "adjusted" downward the amount of refunds that were due to certain clients. This adjustment program skimmed a certain percentage from the lump-sum refund that was owed to clients and reassigned it to the fictious GRX Stores.  Volkes had the program installed on Fallon's computer so that Fallon could decide when to run the adjustment program and what percentage to skim from the clients' refunds.  Volkes did this in order to repay a loan he had taken out to satisfy a civil judgment against him issued by a Missouri court.

8

### 5.      *Money Laundering Conspiracy*

In addition to the fraud schemes, the Government alleged that Guaranteed Returns, Volkes, and Fallon conspired to launder the fraud proceeds corresponding to the indate products that had been diverted from clients and reclassified as belonging to GRX Stores. Since the company received all refund payments as a lump-sum from manufacturers, the Government alleged that the fraud proceeds were initially commingled with the "legitimate" refunds due to clients, as well as the company's service fees, in the lump-sum refund received into the company's general operating account. Once clients were paid, the Government alleged that Appellants transferred the fraud proceeds out of the general operating account and eventually into Volkes's personal account through a series of complex transactions designed to conceal the nature, location, source, ownership, and control of these proceeds.

### B.      Procedural History

The Government brought 64 charges against Guaranteed Returns, Volkes, and Fallon.[6]  Counts 1–23 charged Guaranteed Returns and Volkes with wire fraud,[7] and Counts 24–40 charged them with mail fraud arising from the same schemes.[8]  Counts 41–52 charged all Appellants with

---

[6] The Government obtained a superseding indictment against Appellants.  We refer to this superseding indictment as the "indictment" for brevity.

[7] In violation of 18 U.S.C. § 1343.

[8] In violation of 18 U.S.C. § 1341.

mail fraud,[9] Count 53 charged Guaranteed Returns and Volkes with theft of Government property in the form of more than $27 million worth of pharmaceutical products,[10] and Count 54 charged all Appellants with conspiracy to launder money.[11]

After a seven-week trial, Guaranteed Returns was convicted on all counts; Volkes was convicted on Counts 1–55 and 62–64; and Fallon was convicted on Counts 41–52, 54, and 56–61. The jury acquitted on the remaining counts. All Appellants moved for a judgment of acquittal or a new trial, which the District Court denied.

The indictment also listed two forfeiture counts. The first count sought forfeiture of $180,673,777, and the second sought forfeiture attributable to Appellants' money laundering conspiracy. Both counts sought substitution of other assets if those sought were commingled or not traceable. After the jury's trial verdict, the District Court held a one-day forfeiture trial, at which the Government sought to proceed against two bank accounts. The jury found that the funds in those accounts were subject to forfeiture.

At sentencing, the Court sentenced Fallon to one year and one day in prison, followed by three years' supervised

---

[9] In violation of 18 U.S.C. §§ 1341, 1349.

[10] In violation of 18 U.S.C. §§ 641, 2. *See also* App. 383.

[11] In violation of 18 U.S.C. § 1956(h). Additionally, Count 55 charged a conspiracy to obstruct justice, while Counts 56–59 and 62–63 charged substantive obstruction of justice, and Counts 60, 61, and 64 charged making false statements. These charges are not the subject of any specific challenges on appeal.

release, and sentenced Volkes to five years' imprisonment, with three years' supervised release.[12]  The Court sentenced Guaranteed Returns to five years' probation with restrictions on how the company may operate.  The Court also ordered Appellants to pay two restitution awards.  The first restitution amount was $94,737,868.16, to be paid jointly and severally by Volkes and Guaranteed Returns.  The second restitution amount was $515,221.89, to be paid jointly and severally by Volkes, Fallon, and Guaranteed Returns.[13]  Finally, the Court entered a forfeiture judgment of $114,832,445.62 against Guaranteed Returns.

## II.    Discussion

The District Court had jurisdiction over this federal criminal prosecution under 18 U.S.C. § 3231.  We have appellate jurisdiction under 28 U.S.C. § 1291 to review the convictions, and under 18 U.S.C. § 3742 to review the sentences.  Our standard of review varies with each challenge that Appellants raise to their convictions and sentences.  We address each challenge and the corresponding standard of review in the sections below.

### A.    The 2011 Warrant Was Not a General Warrant

Fallon argues that the very first search warrant that the Government obtained in the investigation was an unconstitutional general warrant.  This Court reviews the facts

---

[12] Fallon and Volkes do not appeal the custodial aspects of their sentences.

[13] Volkes and Guaranteed Returns were therefore ordered to pay a total restitution award of $95,253,090.05.

11

determined at a suppression ruling for clear error, but exercises plenary review over the application of law to those facts.[14]

On March 29, 2011, the Government obtained five search warrants, including one authorizing a search of Guaranteed Returns's headquarters in Holbrook, New York.[15] When executing this warrant, the agents found significant amounts of evidence relating to Guaranteed Returns's fraud schemes, including hard drives that Fallon had told investigators the company did not have. Before trial, Appellants moved to suppress all the evidence obtained under the 2011 warrant.[16] They argued that the warrants were insufficiently particularized and therefore unconstitutional general warrants, but the District Court disagreed and denied the motion to suppress. Appellants repeat these contentions on appeal, but we agree with the District Court that the 2011 warrant was sufficiently particularized.

---

[14] *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002).

[15] Specifically, the Government obtained authorization to search Guaranteed Returns's headquarters, warehouse, and a safe deposit box held at a local bank, as well as the residences of two employees of the company's information technology department.

[16] Before trial Appellants also sought to suppress evidence uncovered under a 2014 search warrant. Appellants' opening briefs do not challenge any aspect of the 2014 warrants. Appellants have thus waived any argument relating to these warrants. *See United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005), *as amended* (Mar. 8, 2005) ("It is well settled that an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal.").

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[17]  It also requires warrants to be supported by probable cause and to "particularly describ[e] the place to be searched, and the persons or things to be seized."[18]  Although the phrase "general warrants" does not appear in the text of the Fourth Amendment, the term refers to a specific form of authorization abhorred by the founders, which authorized "a general, exploratory rummaging in a person's belongings."[19]  Accordingly, the particularization requirement was included to prohibit these general warrants.[20]  A general warrant is one that is insufficiently particularized in either the places to be searched or the persons or things to be seized.[21]

Whether a warrant is sufficiently particularized depends on the nexus between the evidence to be sought or seized and the alleged offenses.[22]  Where a warrant affidavit provides probable cause to believe that it will uncover evidence of a wide-ranging and long-lasting scheme with multiple participants, an equally broad search for such evidence is permissible.[23]  In *United States v. Yusuf*, this Court held that

---

[17] U.S. Const. amend. IV.

[18] *Id.*

[19] *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971), *holding modified by Horton v. California*, 496 U.S. 128 (1990).

[20] *Id.*

[21] *United States v. Christine*, 687 F.2d 749, 753 (3d Cir. 1982).

[22] *United States v. Yusuf*, 461 F.3d 374, 394 (3d Cir. 2006).

[23] *Id.*

warrants that sought a broad range of documents and records were not general warrants because "(1) they specified that agents were searching for evidence of several specifically enumerated federal crimes; (2) the search was limited in time to [an eleven-year period]; and (3) the evidence sought was limited to records pertaining to [specified corporations and defendants]."[24] The offenses in *Yusuf* also included mail fraud and money laundering.[25]

The warrant here is strikingly similar to the one in *Yusuf*. In both cases, the Government sought a broad range of business records relating to multi-year schemes of mail fraud and a money laundering conspiracy. The alleged schemes here were arguably broader than those in *Yusuf* since they involved vastly larger sums and many more defrauded clients, and they therefore needed much more information to put together. Despite this greater breadth, the warrants here were precisely as limited as those in *Yusuf*: the Government sought Guaranteed Returns's records relating to five enumerated federal offenses, identified by statutes, and limited to a ten-year period. This warrant is not impermissibly general.

Furthermore, the Government argues that, even if the warrant was deficient, the good-faith exception would prevent suppression here. We agree. Under the good-faith exception to the exclusionary rule, if an officer relies in good faith on a warrant later found to be deficient, evidence obtained pursuant to that warrant should be suppressed only if the officer had—or may be fairly charged with—knowledge of the deficiency.[26]

---

[24] *Id.* at 395.

[25] *Id.* at 378.

[26] *United States v. Leon*, 468 U.S. 897, 922–23 (1984).

We have also recognized that an officer's reliance on a warrant would not be reasonable and thus would not trigger the good-faith exception if "the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized."[27] The 2011 warrant here is not so deficient. The warrant contains an extensive recitation of the place to be searched and the items to be seized, with further hand-written limitations added by the magistrate judge. Under these circumstances, suppression would not serve to deter future law enforcement misconduct, and the evidence seized pursuant to the 2011 warrant is admissible.

**B.    Civil Contract Law Expert and Proposed Jury Instructions**

Appellants next argue that the District Court erred in precluding expert testimony on civil contract law. We review the District Court's decision to exclude expert testimony for abuse of discretion.[28]

### 1.    *Proposed Testimony of Prof. Finkelstein*

Appellants sought to have University of Pennsylvania Carey Law School Professor Claire Finkelstein testify in their defense. They argued that her testimony on civil contract law would oppose that of Guaranteed Returns's sales representatives and clients who testified regarding their understandings of the company's contracts and return authorization forms, and would also demonstrate that there was

---

[27] *United States v. Zimmerman*, 277 F.3d 426, 437 (3d Cir. 2002).

[28] *United States v. Heinrich*, 971 F.3d 160, 163 (3d Cir. 2020).

a reasonable interpretation of those documents that was consistent with Appellants' good faith.

The Government opposed this testimony, claiming that contract law could be considered governing, and that the Court would instruct the jury as to the governing law. Lay witnesses, on the other hand, discussed the contract terms and other representations based on their personal knowledge and involvement, and did not purport to interpret them. The District Court agreed with the Government, finding that the expert testimony would be confusing and unnecessary, without expressly citing to a rule of evidence, but presumably excluding it under Federal Rules of Evidence 403 and 702, respectively. Later, in denying Appellants' motion for a new trial, the District Court addressed its prior rulings in more depth, finding that the testimony was properly excluded under three Federal Rules of Evidence: (1) under Rule 401 because the testimony was irrelevant to the criminal fraud case before the jury; (2) under Rule 403 because the marginal probative value of the testimony would be substantially outweighed by the danger of confusing the jury; and (3) under Rule 702 because the testimony would not have been helpful to the jury as expert witness testimony. Appellants attack all three rationales on appeal but fail to demonstrate an abuse of discretion.

a)      Exclusion as Confusing Under Rule 403

At trial, the District Court stated that Prof. Finkelstein's testimony should be excluded because it "would have a tendency to confuse the jurors."[29] Under Rule 403, a district court may exclude otherwise relevant evidence "if its probative

---

[29] App. 4377.

16

value is substantially outweighed by a danger of . . . confusing the issues."[30] The commands of Rule 403 are "inexact, 'requiring sensitivity on the part of the trial court to the subtleties of the particular situation, and considerable deference on the part of the reviewing court to the hands-on judgment of the trial judge.'"[31] "We will not disturb the District Court's ruling unless it was arbitrary or irrational."[32] Where, as here, the District Court did not explicitly articulate the balancing test on the record, we may either conclude that the Court implicitly performed the test; or, if we find that the District Court did not perform it, we may perform the test ourselves on review.[33]

We find that the District Court implicitly performed the Rule 403 balancing test. It heard detailed argument on this question and raised the issue of confusion with defense counsel, noting that admitting the testimony could "turn this case into a contract case even though it's a fraud case."[34] The District Court's concern is understandable: having a well-credentialed law professor testify as an expert on contract law would inevitably cause the jury to believe that the contractual

---

[30] Fed. R. Evid. 403.

[31] *Egan v. Del. River Port Auth.*, 851 F.3d 263, 275 (3d Cir. 2017) (quoting *United States v. Vosburgh*, 602 F.3d 512, 537 (3d Cir. 2010)).

[32] *Vosburgh*, 602 F.3d at 537 (quoting *United States v. Kellogg*, 510 F.3d 188, 197 (3d Cir. 2007) (internal quotation marks omitted).

[33] *See Egan*, 851 F.3d at 276 (citing *United States v. Eufrasio*, 935 F.2d 553, 572 (3d Cir. 1991)).

[34] App. 4373.

terms were at issue in the case. The Government also argued that the confusion could extend to the relevant source of law, substituting the expert's testimony for the District Court's instructions. Excluding evidence that could confuse the dispositive issue in the case is not an abuse of discretion.[35]

Additionally, under Rule 403, the risk of confusion to the jurors must be offset against the probative value of the evidence, and here the probative value was small. Appellants' rationale for admitting Prof. Finkelstein's testimony was to demonstrate that their interpretations of the contracts were reasonable, and could support a defense of good faith. However, as an expert, Prof. Finkelstein could not testify as to Volkes's subjective good faith or actual belief; she could only address what was a reasonable interpretation of the contracts. And to demonstrate a good faith belief negating his intent, Volkes did not need to show that he held a reasonable interpretation of the contracts, only that he did in fact believe that the contracts entitled him to keep indate refunds. An unreasonable belief would suffice.[36] Prof. Finkelstein's testimony was therefore properly excluded under Rule 403 because it had very limited probative value, which was clearly outweighed by the risk of confusing the jury.

---

[35] *McKenna v. City of Phila.*, 582 F.3d 447, 461 (3d Cir. 2009) (excluding police directives on use of force in § 1983 case on excessive force as it could confuse the jury as to the relevant violation under consideration).

[36] *See Cheek v. United States*, 498 U.S. 192, 203–04 (1991); *United States v. Jimenez*, 513 F.3d 62, 75 (3d Cir. 2008) (noting that good faith negates intent to defraud).

18

> b) Exclusion as Not Helpful under Rule 702 and as Irrelevant under Rule 401

The District Court's other rationale for exclusion at trial was that Prof. Finkelstein's expert testimony would not be helpful to the jury.[37] Under Rule 702(a), an expert may testify in the form of an opinion if the expert's "specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue."[38] Expert testimony is "helpful" if it is sufficiently tied to the facts of the case such that it will help the jury resolve a factual dispute.[39]

As previously discussed, the probative value of Prof. Finkelstein's expert testimony on contract law was small. The testimony would not help the jury determine a fact in issue because there was no genuine factual dispute as to whether Guaranteed Returns entered into contracts with its clients. Appellants could be convicted of mail and wire fraud even if they had behaved consistently with their obligations under the contracts, because the relevant question was their intent to defraud. To the extent that Prof. Finkelstein's opinion bears on the relevant governing law of the case, it would be unhelpful under Rule 702 "because it would usurp the District Court's pivotal role in explaining the law to the jury."[40]

---

[37] App. 4377 (finding that Prof. Finkelstein's testimony "is not something that is necessary to have an expert testify").

[38] Fed. R. Evid. 702(a).

[39] *United States v. Schiff*, 602 F.3d 152, 173 (3d Cir. 2010).

[40] *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006).

19

The same rationale indicates why Prof. Finkelstein's testimony was not relevant under Rule 401. Evidence is relevant if it has "any tendency to make a fact [of consequence in determining the action] more or less probable than it would be without the evidence."[41] As Prof. Finkelstein could not testify to the only fact of consequence—Appellants' subjective beliefs—her testimony did not bear on any of Appellants' guilt. Prof. Finkelstein's testimony was therefore properly excluded.

### 2. Contract Law Jury Instructions

In the alternative, Appellants claim that the District Court should have instructed the jury on principles of civil contract law and included an instruction that a breach of contract is not fraud. We review a denial of a requested jury instruction for abuse of discretion.[42]

Appellants characterize this argument as the denial of a theory of the defense, but this is not strictly accurate. Appellants' theory was that they acted in good faith, and they claim that principles of civil contract law would support this inference. Even assuming that this standard applies, the argument still fails. A defendant is entitled to a theory-of-defense jury instruction if (1) he proposes a correct statement of the law; (2) his theory is supported by the evidence; (3) the theory of defense is not part of the charge; and (4) the failure to include an instruction of the defendant's theory would deny him a fair trial.[43]

---

[41] Fed. R. Evid. 401.

[42] *Jimenez*, 513 F.3d at 74.

[43] *United States v. Sussman*, 709 F.3d 155, 178 (3d Cir. 2013).

20

Appellants cannot meet this standard. The good-faith defense was already part of the jury charge. The District Court instructed the jury that "[a] person acts in good faith when he or she has an honestly held belief, opinion, or understanding that his or her conduct was not unlawful, even though that belief, opinion, or understanding turns out to be inaccurate or incorrect."[44] This is a correct statement of the law that permitted the jury to find in Appellants' favor, with or without concluding that they complied with their contract obligations. Instructions on civil contract law are not supported by the evidence here, as they would not bear on Appellants' good faith for the reasons discussed above. In addition, Appellants cannot demonstrate that denying their proposed instruction on contract law deprived them of a fair trial. The jury was instructed on the good faith defense, and the District Court therefore did not err in not instructing the jury on civil contract law.

### C. Constructive Amendment to Indictment's Mail Fraud Counts 41–52

Appellants claim that the Government constructively amended Counts 41–52 by varying their proof at trial from the charges presented to the grand jury. Our review of a constructive amendment claim is plenary.[45]

A constructive amendment occurs where "the evidence and jury instructions at trial modify essential terms of the charged offense in such a way that there is a substantial

---

[44] App. 5428.

[45] *United States v. Centeno*, 793 F.3d 378, 389 n.10 (3d Cir. 2015).

likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged."[46] Trial evidence, arguments, or the district court's own instructions can all form the basis of constructive amendments.[47] A constructive amendment is *per se* reversible error because it deprives a defendant of his Fifth Amendment right to be tried on charges presented to the grand jury.[48] The "key inquiry" in a constructive amendment claim "is whether the defendant was convicted of the same conduct for which he was indicted."[49]

Counts 41–52 charged Appellants with mail fraud. The indictment claimed that Guaranteed Returns, Volkes, and Fallon told clients that their negotiated fees were "all inclusive," but in reality they charged additional hidden fees.[50] These hidden fees were implemented through changes to computer code made by the company's information technology department, and "[a]mong those programs" was the "adjustment" scheme that reduced the amount due to a client by a certain percentage, with Guaranteed Returns keeping that percentage.[51] Volkes instructed employees to create the necessary code, and Fallon applied it to certain client refunds.

---

[46] *United States v. Daraio*, 445 F.3d 253, 259–60 (3d Cir. 2006).

[47] *United States v. McKee*, 506 F.3d 225, 229 (3d Cir. 2007).

[48] *Daraio*, 445 F.3d at 260; *Vosburgh*, 602 F.3d at 531.

[49] *Daraio*, 445 F.3d at 260 (quoting *United States v. Robles-Vertiz*, 155 F.3d 725, 729 (5th Cir. 1998)).

[50] App. 379.

[51] App. 380.

The indictment also identified twelve mailings in furtherance of the scheme.

Appellants argue that these counts were constructively amended because the only hidden fee scheme mentioned in the indictment was the adjustment program, but at trial, the Government claimed the indictment encompassed additional schemes. Specifically, they contend that the verdict form and the Government's summation permitted the jury to convict them of other fraudulent schemes.

Appellants' argument fails as to the verdict form because the form tracks the language of the indictment precisely. The indictment claimed that Appellants charged their clients "additional hidden fees," despite their representations to the contrary, while the verdict form claims that they "charg[ed] undisclosed fees."[52] The indictment also charged that this scheme was implemented through changes to the company's computer programs, and that "[a]mong those programs" was the "adjustment" scheme; the verdict form states that the scheme included "an adjustment program."[53] There is no material difference between the indictment and the verdict form, and thus the form cannot be said to have expanded the scope of the charges in the indictment.

Appellants' remaining argument is that, because the indictment charged only the adjustment scheme, the Government's references during summation to other hidden

---

[52] *Compare* App. 379 (indictment) *with* App. 6368 (verdict form).

[53] *Compare* App. 380 (indictment) *with* App. 6368 (verdict form).

23

fees that could form the basis of these mail fraud counts constructively amended the indictment. They claim that the indictment charged only the adjustment scheme because, despite its references to that scheme being one "among" the other "programs" that the company used to extract additional hidden fees, the grand jury testimony only addressed the adjustment program. Interpreting the indictment's text in light of that testimony, Appellants claim that references to other fee schemes expanded the scope of the indictment.

Appellants offer no basis for looking behind the indictment's text in order to interpret it. Relying on two cases from one of our sister circuits, they argue that, by looking through the indictment to the testimony before the grand jury, we may determine that the Government only charged the adjustment scheme.[54] But neither case supports interpreting the text of an indictment by looking to grand jury testimony.[55]

---

[54] *See United States v. Milstein*, 401 F.3d 53, 64–66 (2d Cir. 2005); *United States v. Cervone*, 907 F.2d 332, 345 (2d Cir. 1990).

[55] In each case, the Second Circuit did not interpret the text of the indictment by consulting grand jury testimony. In *United States v. Milstein*, the Court found a constructive amendment without consulting grand jury testimony at all, but merely noted in passing that the Government had not sought to amend one charge in that indictment at the same time it sought a formal amendment to correct a jurisdictional defect. 401 F.3d at 65–66. In *United States v. Cervone*, the Court looked to grand jury testimony because one defendant was charged with perjury for lying to a grand jury about whether he had engaged in bid rigging. 907 F.2d at 345. It did not seek to interpret the indictment by consulting the grand jury testimony.

24

We can also find no basis for looking to anything other than the text of the indictment itself to determine its meaning. Doing so would undermine the rationale for constructive amendment challenges, to guard jealously the grand jury's charging role. As the Supreme Court has noted:

> If it lies within the province of a court to change the charging part of an indictment to suit its own notions of what it ought to have been, or what the grand jury would probably have made it if their attention had been called to suggested changes, the great importance which the common law attaches to an indictment by a grand jury, as a prerequisite to a prisoner's trial for a crime, and without which the constitution says 'no person shall be held to answer,' may be frittered away until its value is almost destroyed.[56]

This Court has no more authority to subtract a scheme charged in an indictment than it does to add others, and parsing the minutes of the grand jury testimony would be to draw a different conclusion from the very same evidence before it. This would utterly remove the grand jury's role and render that

---

[56] *Stirone v. United States*, 361 U.S. 212, 216 (1960) (quoting *Ex parte Bain*, 121 U.S. 1, 10 (1887)).

portion of the Fifth Amendment a nullity.[57]  We must limit ourselves to the text of the indictment when construing its meaning.  In doing so, we find that the indictment here charged "hidden fees" schemes, one of which was the adjustment program, and that the Government's references to other hidden fee schemes did not expand the scope of the indictment.

Finally, the District Court's instructions on mail fraud would also preclude finding a constructive amendment, as the instructions limited the jury to the adjustment scheme anyway.[58]  To find Appellants guilty on Counts 41–52, the jury had to find that each mail fraud count was supported by a mailing that furthered the scheme.[59]  Counts 41–52 identified twelve such mailings, each alleged to further one of the twelve counts.  The District Court instructed the jury that, in order to find Appellants guilty, the Government had to prove that "the use of the United States Mails . . . in some way furthered or

---

[57] We also note that, in the context of challenges to probable cause findings for pretrial freezes of assets possibly subject to forfeiture, the Supreme Court has prohibited looking to what was presented to the grand jury to determine if it actually amounts to probable cause.  *Kaley v. United States*, 571 U.S. 320, 328 (2014).  The same rationale of protecting the grand jury's historic role applies equally in this context.

[58] *See Daraio*, 445 F.3d at 261 ("[T]he district court obviated the possibility of the indictment being constructively amended by issuing accurate and thorough jury instructions precluding the jury from convicting [the appellant] for any conduct other than that which the indictment charged.").

[59] *United States v. Cross*, 128 F.3d 145, 150 (3d Cir. 1997).

advanced or carried out the scheme."[60]  Thus, for Counts 41–52, the Government had to connect each of the identified mailings to a scheme to defraud.  The evidence demonstrates that the Government connected each of the mailings referenced in those counts to checks for batches that had been reduced through application of the adjustment program.  As we presume that the jury followed the District Court's instructions, the jury could not freely conclude that the mailings were in furtherance of a different scheme.[61]  We can thus be certain that Appellants were convicted on the adjustment scheme.  Accordingly, Appellants' constructive amendment claim fails.

### D.     Sufficiency of the Evidence Challenges

Fallon and Volkes also argue that the evidence was insufficient to support either the mail fraud convictions in Counts 41–52, or the conviction for the money laundering conspiracy in Count 54.  We review sufficiency of the evidence challenges under a deferential standard, viewing the evidence in the light most favorable to the prosecution and asking whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.[62]  We address each challenge in turn.

---

[60] App. 5423.

[61] *United States v. Givan*, 320 F.3d 452, 462 (3d Cir. 2003).

[62] *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 424–25 (3d Cir. 2013) (en banc).

### 1. Mailings in Furtherance of Fraudulent Scheme in Counts 41–52

Fallon and Volkes claim that the evidence was insufficient to support their mail fraud convictions as it did not demonstrate that the mailings in question were in furtherance of mail fraud. The mail fraud statute makes it an offense to make use of the mails "for the purpose of executing" a scheme or artifice to defraud.[63] The statute is expansive, and does not require the defendant's use of the mails to be an essential element of the scheme.[64] "All that is required is that the defendants knowingly participated in a scheme to defraud and caused a mailing to be used in furtherance of the scheme."[65] To be "in furtherance" of a scheme to defraud, the relevant mailings "must be sufficiently closely related to the scheme to bring the conduct within the ambit of the mail fraud statute," and the scheme must depend in some way on the charged mailings.[66] These can include mailings after the scheme has come to fruition, "if designed to lull the victims into a false sense of security" or to make it less likely that the scheme would be discovered.[67]

---

[63] 18 U.S.C. § 1341.

[64] *United States v. Pharis*, 298 F.3d 228, 234 (3d Cir. 2002), *as amended* (Sept. 30, 2002) (en banc).

[65] *Id.*

[66] *United States v. Coyle*, 63 F.3d 1239, 1244 (3d Cir. 1995).

[67] *Id.*; *see also Schmuck v. United States*, 489 U.S. 705, 714 (1989) (mailing registration paperwork to state motor vehicles department was sufficiently connected to a scheme to defraud by selling cars with rolled back odometers because failing to do so could jeopardize the success of the scheme).

Fallon and Volkes argue that the twelve checks Fallon mailed were not in furtherance of the scheme because the fraud was completed by the time the checks were mailed. The adjustment scheme worked by having Guaranteed Returns submit batches of drugs for refunds, and once the company received the refunds, Fallon used a computer program to reduce amounts that would otherwise be due to clients by a percentage. She then authorized mailing checks with the lower, reduced amounts to Guaranteed Returns' clients, while the company kept the difference. This scheme operated by "essentially skim[ming] a percentage and put[ting] it into" the fictitious GRX Store account.[68] Because the program allocated the percentage to Guaranteed Returns before the checks were mailed, Fallon and Volkes argue that the Government has not shown that these mailings were in furtherance of the scheme. But the record shows just the opposite. The point of the scheme was to divert to Guaranteed Returns a portion of funds that should rightly go to clients, and the scheme could only be accomplished if the company's clients received less than they were due, in amounts that would not generate suspicion. Mailing the checks both ensured that Guaranteed Returns' clients received less than they were due and reduced the likelihood of detection. The evidence was therefore sufficient to demonstrate that mailing the checks was in furtherance of the fraud.

Fallon and Volkes argue that *United States v. Altman* from the Second Circuit supports their view, but they misread that case. In *Altman*, a court-appointed attorney embezzled money from two estates to invest in a Brazilian dance show

---

[68] App. 2938.

that later collapsed.[69]  The attorney was charged and convicted of mail fraud based on mail sent to him, either by other attorneys as part of court-ordered accounting proceedings, or by a bank at which he maintained an account.[70]  The Second Circuit ruled that none of these mailings furthered Altman's schemes since they occurred after he had embezzled the funds: "A mailing cannot be said to be in furtherance of a scheme to defraud when it occurs after the scheme has reached fruition."[71]  Reliance on *Altman* does not help Fallon or Volkes because the mailings in that case were "insufficiently related to Altman's scheme to be said to be in furtherance of it" and were not "incident to any essential part of [the] scheme to defraud the estates."[72]  In contrast, mailing the checks here was a necessary step in depriving clients of their refund amounts. Rather than happening after the scheme was accomplished, mailing the checks was "sufficiently closely related to the scheme," and in fact was "an essential part of the scheme."[73] The jury therefore had sufficient evidence to convict Appellants on the mail fraud charges.

> 2. *Money Laundering Conspiracy in Count 54*

Appellants argue that the evidence was insufficient for a reasonable jury to find that they conspired to engage in financial transactions designed to conceal the nature or source of the proceeds from the fraud schemes.  We agree.

---

[69] 48 F.3d 96, 98–101 (2d Cir. 1995).

[70] *Id.* at 103–04.

[71] *Id.* at 103.

[72] *Id.*

[73] *See Coyle*, 63 F.3d at 1244.

Appellants were charged with conspiring to commit concealment money laundering under 18 U.S.C. § 1956(a)(1)(B)(i) by laundering the proceeds of the indate fraud schemes through complex financial transactions designed "to conceal or disguise the nature, location, source, ownership and control of the proceeds."[74]   To prove a conspiracy to launder money, the Government must show (1) an agreement between two or more persons to launder money; and (2) that the defendant knowingly became a member of the conspiracy.[75]  The agreement must be one that, if completed, would satisfy the elements of the underlying substantive

---

[74] *See* App. 384–86 (Count 54); *see also* 18 U.S.C. § 1956(a)(1)(B)(i) (substantive offense of concealment money laundering), 1956(h) (conspiracy to violate § 1956).

There are two types of money laundering under 18 U.S.C. § 1956(a)(1), both of which involve financial transactions with proceeds from unlawful activity.   Concealment money laundering under § 1956(a)(1)(B) is money laundering done with knowledge that the financial transactions are designed to conceal the proceeds of specified unlawful activity. *United States v. Omoruyi*, 260 F.3d 291, 294–95 (3d Cir. 2001) (citing 18 U.S.C. § 1956(a)(1)(B)).   This is the type of money laundering charged here.   In contrast, promotional money laundering under § 1956(a)(1)(A) is money laundering conducted with the proceeds of specified unlawful activity with the intent to promote certain further illegal activity. *Id.* (citing 18 U.S.C. § 1956(a)(1)(A)).

[75] *United States v. Greenidge*, 495 F.3d 85, 100 (3d Cir. 2007). An overt act is not required to prove a conspiracy to violate § 1956(h). *Whitfield v. United States*, 543 U.S. 209, 219 (2005).

offense—in this case, concealment money laundering.[76] The Government therefore must prove that Appellants knowingly conspired to engage in (1) an actual or attempted financial transaction; (2) involving the proceeds of a specified unlawful activity; (3) with knowledge that the transaction involves the proceeds of some unlawful activity; and (4) with knowledge that the transaction was designed in whole or in part to conceal the nature, location, source, ownership or control of the proceeds of that activity.[77]

There is a fine line between the concealment inherent in fraud offenses and concealment money laundering. "Congress did not enact money laundering statutes simply to add to the penalties for various crimes in which defendants make money."[78] This Court has found that 18 U.S.C. § 1956(a)(1) "addressed this concern, and therefore delineated clearly [the difference] between the underlying offense and the money laundering offense, by including an intent requirement," namely "the intent to conceal or disguise the nature, source, ownership and control of the proceeds of the . . . fraud," as distinct from the intent to commit the underlying fraud itself.[79] Even the Supreme Court has warned about the danger of reading the money laundering statute in a way that would "merge" money laundering with the transactions inherent to the underlying crime that generates the proceeds to be laundered because "Congress [did not] want[] a transaction

---

[76] *See Ocasio v. United States*, 578 U.S. 282, 287 (2016).

[77] *United States v. Richardson*, 658 F.3d 333, 337–38 (3d Cir. 2011).

[78] *United States v. Conley*, 37 F.3d 970, 979 (3d Cir. 1994).

[79] *Omoruyi*, 260 F.3d at 295.

that is a normal part of a crime it had duly considered and appropriately punished elsewhere in the Criminal Code to radically increase the sentence for that crime."[80]

There are two good reasons to guard the line between fraud concealment and money laundering concealment. First, in many cases, "the addition of a money laundering charge can result in . . . a sentence that is much larger than the sentence for the predicate offense."[81] That is because a defendant can be charged based on the full value of the laundered assets, even if that defendant did not participate in the underlying fraud that generated the fraud proceeds.

Second, a money laundering conviction can add significant financial penalties. Where ill-gotten funds are commingled with legitimate funds in an account, many of our sister circuits have held that the Government can take the entire account, including the value of both the ill-gotten and legitimate funds, because the account helped "facilitate" the laundering by concealing the ill-gotten funds.[82] These financial penalties demonstrate how tacking on a money laundering charge can vastly extend the prosecution's reach. At best, it could subject companies to enormous forfeiture

---

[80] *United States v. Santos*, 553 U.S. 507, 517 (2008) (Scalia, J.) (plurality opinion).

[81] Rachel Zimarowski, *Taking a Gamble: Money Laundering After* United States v. Santos, 112 W. Va. L. Rev. 1139, 1146–47 (2010).

[82] *See, e.g.*, *United States v. Hawkey*, 148 F.3d 920, 928 n.13 (8th Cir. 1998); *United States v. Tencer*, 107 F.3d 1120, 1133–36 (5th Cir. 1997); *United States v. Bornfield*, 145 F.3d 1123, 1135–36 (10th Cir. 1998).

obligations based on relatively minor fraud schemes. At worst, it could motivate prosecutors to bring money laundering charges in almost every fraud case. For example, if a company commits a relatively small fraud, treats the proceeds of that fraud as revenue, and circulates that money through several accounts within the company just as it would with legitimate revenue, every account through which the fraud proceeds pass could be subject to forfeiture under 18 U.S.C. § 982 for being "involved in" money laundering. This would be well beyond the value of the fraud proceeds themselves that would be subject to forfeiture.

The "classic" money laundering case is where a "drug trafficker collects large amounts of cash from drug sales and deposits the drug proceeds in a bank under the guise of conducting a legitimate business transaction."[83] In *United States v. Richardson*, we also said that "funneling cash through an ostensibly legitimate business—a classic example of money laundering—is ordinarily sufficient to prove a design to conceal the nature and source of the money."[84] However, *Richardson* and the other cases we cited to support this statement in *Richardson* all concerned proceeds from illicit drug dealing being funneled into a completely separate legitimate business or activity.[85] The fraud schemes and

---

[83] *Conley*, 37 F.3d at 981 n.14 (quoting under *United States v. LeBlanc*, 24 F.3d 340, 346 (1st Cir. 1994)).

[84] *Richardson*, 658 F.3d at 341 (citing *United States v. Rivera–Rodriguez*, 318 F.3d 268, 277 (1st Cir. 2003); *United States v. Jackson*, 935 F.2d 832, 842 (7th Cir. 1991)).

[85] *See, e.g.*, *Richardson*, 658 F.3d at 334–36 (funneling drug proceeds into a recording label); *Rivera-Rodriguez*, 318 F.3d at 271–72, 276–77 (funneling drug proceeds into a

alleged money laundering conspiracy at issue here did not concern the proceeds of illegitimate drug dealing being funneled into Guaranteed Returns's legitimate business.

Concealment money laundering is not limited to the "classic" example. An essential element of money laundering is the intent to conceal the nature, location, source, ownership, or control of the ill-gotten proceeds. Evidence supporting an intent to conceal can come in many forms, including:

> statements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on practices of criminals.[86]

Other circuits have held that simply moving ill-gotten funds from one account to another or from one person to another is not enough, absent evidence that the transfer was outside of

---

construction company, and using drug proceeds to purchase and then sell speedboats); *Jackson*, 935 F.2d at 840–42 (funneling drug proceeds into a church bank account).

[86] *Richardson*, 658 F.3d at 340 (quoting *United States v. Garcia–Emanuel*, 14 F.3d 1469, 1475–76 (10th Cir. 1994)).

normal operations or that the irregularity was designed to obscure an aspect of the ill-gotten proceeds.[87]

Critically for our purposes, however, concealment money laundering, whether classic or otherwise, requires financial transactions involving "proceeds" of the fraud,[88] and ill-gotten funds do not become "proceeds" until *after* a defendant receives them.[89]  After that point, transactions in those funds that are designed to conceal, such as a deliberate commingling of illicit and lawful funds, can form the basis of a money laundering charge.  But any transactions that occur *before* a defendant obtains the fruits of its fraudulent scheme fall outside of § 1956(a)'s scope.  Thus, a defendant's mere receipt of funds as a result of a fraudulent transaction cannot itself constitute money laundering, and that is true even if the funds received include illicit funds commingled with lawfully obtained funds.

Here, what constituted normal operations of the company was established largely through the testimony of Daniel Stieglitz, the Vice President of Finance in Guaranteed Returns.  He testified at length about the accounting practices

---

[87] *See, e.g.*, *United States v. Blankenship*, 382 F.3d 1110, 1131 (11th Cir. 2004) (reversing a money laundering conviction where transactions involved moving funds deposited from one account bearing the defendant's name into another); *United States v. Willey*, 57 F.3d 1374, 1388 (5th Cir. 1995) (reversing a money laundering conviction where the transaction involved transferring funds from a personal brokerage account to a personal checking account).

[88] 18 U.S.C. § 1956(a)(1)(B)(i).

[89] *See Omoruyi*, 260 F.3d at 296–97.

in the company through his departure from the company in April 2010.[90] Stieglitz was involved in the financial transactions in the company, including moving money between the company accounts, yet he was not aware of the fraud schemes. He explained that, in the ordinary course of business, the company would receive refunds for batches of returned products as lump-sum payments from manufacturers. These lump-sum payments were wired directly into the company's general operating account. The FilePro system would determine how much to refund to clients, which Fallon would review and advise Stieglitz of how many checks to distribute to clients. Stieglitz would transfer the appropriate money from the general operating account to the customer payment account to issue refunds.

The company's service fee was based on a percentage of the value of the returned product, as determined by the manufacturer after they received the returned product. This means that the company did not know what its service fee, i.e., its legitimate profit, would be before sending batched returns to manufacturers. Stieglitz testified that, based on the accounting, "the difference between what we paid out and what we received should have been our fee."[91] Any money left in the general operating account after sending refund payments to clients was "assumed" to be legitimate income and thus spent

---

[90] The Government did not elicit testimony from any Guaranteed Returns employees about the company's banking or accounting practices for the relevant time period after Stieglitz left the company.

[91] App. 3406.

on operations of the facility, payroll, or distributions to Volkes.[92]

Stieglitz further testified that it is "common for companies to have multiple bank accounts" at different financial institutions and to "[f]requently transfer[] funds . . . among those various bank accounts."[93]  Guaranteed Returns maintained five accounts at three different financial institutions during the relevant period of this prosecution: the general operating account, a business investment account, a payroll account, and two accounts for making distributions to clients. Stieglitz moved money between these accounts as needed.  In addition, Stieglitz testified that he was asked "from time to time" to make distributions to Volkes.[94]  Volkes would talk to Fallon about the amount, who would relay that information to Stieglitz. Stieglitz would then talk to the accountant and find out how the distribution was to be made, either through payroll or as a dividend (i.e., profit), for tax filings. Stieglitz would first try to make the distribution from the general operating account, but, if there were not enough funds for the distribution, he would move funds from the customer payment account.

The Government argues that Appellants engaged in "classic" money laundering by commingling their ill-gotten proceeds with legitimate income, and then transferring the commingled funds through various company bank accounts before eventually depositing millions of dollars into Volkes's personal account. It pressed these same arguments with the

---

[92] *See* App. 3405–06.

[93] App. 3458.

[94] App. 3407.

jury at trial. Throughout the prosecution, the Government repeatedly argued that it was in fact the manufacturers' lump sum refund payments to Guaranteed Returns that "concealed" the illicit funds by making them impossible to trace because those refunds commingled legitimate and illegitimate funds. The Indictment charged that Appellants' "fraud proceeds were concealed by commingling them" with legitimate refunds.[95] At trial, the Government's witnesses testified that, although they could trace the stolen indates and all of Guaranteed Returns's financial transactions without difficulty, they could not separate the illicit from the legitimate funds because the funds were "all combined into one large check" when sent by manufacturers to Guaranteed Returns[96] and because the company received its refunds in "a one-lump-sum amount."[97] And in its closing, the Government hammered home that its primary evidence of Appellants' alleged intent to conceal, purportedly supporting the money laundering charge, was the commingling of legitimate and illicit refunds.[98] The

---

[95] App. 385.

[96] App. 4212.

[97] App. 3505.

[98] *See, e.g.*, App. 4981 (describing how, when refunds were deposited with the company, "these monies were all co-mingled. . . . [These] monies[] were all put together, and as a result you could not tell the difference. And that's what the conspiracy was, to launder this money"); *id.* at 4983 (explaining the purpose of the transactions was to conceal because the funds "were not put in some separate account; they were all co-mingled together so the illegal proceeds could not be detected"); *id.* at 4984 ("[W]hat this money laundering case is about is the commingling of funds."); *id.* at 4985 ("[W]hat is at issue here is . . . how [the money] was co-mingled so you

39

Government's lead investigator, Agent Woodring, testified that the refunds for both legitimate clients and from diverted indates were "co-mingled" in the lump-sum payments from manufacturers.[99]

The problem is that, to the extent that the ill-gotten proceeds were "comingled" with other funds, the commingling occurred *before* the money came into Guaranteed Returns's accounts. That is, ill-gotten funds were commingled in the lump-sum payments from manufacturers as part of the fraud schemes, and, as evident in the foregoing record excerpts, the theory the Government conveyed to the jury was that Appellants "caused the proceeds of these [indate] frauds to be deposited into the Company's bank accounts," thereby suggesting the refunds were "proceeds" of fraud before manufacturers paid them into Appellants' bank account in the first place.[100]

But money from unlawful activity does not become "proceeds" until it is "derived from an already completed offense, or a completed phase of an ongoing offense."[101] This means that a money-laundering transaction can only occur *after* funds obtained from unlawful activity (e.g., fraud

---

could not tell the difference between the illegal money and the legal money that was laundered, and that's what the conspiracy is here.").

[99] App. 4196–97, 6163 ("[T]he stolen indate, the money is comingled with the money from the other customers that had returned product legitimately.").

[100] App. 4981 (emphasis added).

[101] *Conley*, 37 F.3d at 980.

schemes) are delivered into the defendant's possession.[102]  In this case, money from the lump-sum payments from manufacturers did not become "proceeds" until after the lump-sum payments were deposited into Guaranteed Returns's general operating account, and after refund checks were issued to clients, minus the money from the diverted indates or the adjustment scheme.  At that point, the fraud offenses were complete.  The funds remaining in the general operating account were the legitimate profits from service fees, the money "skimmed" as part of the adjustment scheme, and the proceeds from the indate fraud schemes.  Stieglitz testified that these remaining funds were assumed to be legitimate profit, in part, because he was unaware of the fraud schemes generating additional funds beyond the legitimate service fees. Accordingly, the only relevant financial transactions for Appellants' money-laundering charge are the transactions that occurred *after* Appellants paid partial refunds to clients from the lump-sum payments.

As to those transactions, however, there is no evidence of Appellants' intent to conceal illicit proceeds separate from their intent to commit the underlying fraud scheme.  We review a sufficiency of the evidence challenge under a "highly deferential" standard,[103] considering the evidence "in the light most favorable to the government."[104]  We can uphold the convictions only if the Government's evidence would permit a

---

[102] *Omoruyi*, 260 F.3d at 296–97.

[103] *Caraballo-Rodriguez*, 726 F.3d at 430.

[104] *United States v. Iglesias*, 535 F.3d 150, 155 (3d Cir. 2008).

41

reasonable jury to "find the essential elements of the crime beyond a reasonable doubt."[105]

In an effort to show otherwise, the Government argues that the transactions between the company's accounts were irregular and complex, consisting of unnecessary steps on a convoluted path, with the ultimate goal of transferring ill-gotten proceeds to Volkes. The Government asserts that the numerous transfers had no purpose other than concealment of the ill-gotten proceeds. Based on the totality of the facts, including the number of transactions and the circumstances surrounding these transactions, the Government argues that there was substantial evidence from which the jury could infer that the transactions were designed, in whole or in part, to conceal or disguise the nature or source of the ill-gotten proceeds.[106]

The evidence belies the Government's argument. Stieglitz testified that it is "common" for companies to have multiple bank accounts at different financial institutions. Guaranteed Returns was such a company. In fact, the evidence shows that Guaranteed Returns was a multi-million-dollar company with hundreds of clients and more than 200 employees or service representatives. Stieglitz also testified that he would move money between accounts to pay for

---

[105] *United States v. Starnes*, 583 F.3d 196, 206 (3d Cir. 2009).

[106] Intent to conceal may also be found with respect to the location, ownership, or control of the ill-gotten proceeds, but the Government on appeal does not specifically argue that the transfers were designed to conceal these aspects. Instead, the Government focuses on the transfers being designed to conceal the source and nature of the proceeds.

42

customer refunds, payroll, and operating expenses, as well as to make distributions to Volkes as the owner and CEO. Neither Stieglitz nor any other witness from Guaranteed Returns described the transfers as irregular. The Government has not pointed to any evidence to show that the company having multiple bank accounts or moving money between them was irregular.

The Government relies heavily on its exhibit 70-28 to show the financial transactions between the various company accounts and Volkes's personal accounts between 2006 and 2014. The Government's exhibit 70-28 is not itself evidence; it is merely a demonstrative aid. Part of the Government's argument as to why the transfers between accounts were unusual was because some transfers moved money back into the general operating account. However, exhibit 70-28 itself illustrates that, of the hundreds of transactions moving billions of dollars between accounts over the multi-year period, only seven transactions for a total of $11.875 million moved money from the customer payment account back into the general operating account.[107] This is a minuscule number, and there is no evidence to suggest that this is unusual—or indicative of intent to conceal—based on Stieglitz's testimony that it was common to move money between accounts for the general operation of the business.

The Government also asserts that the numerous transfers from the general operating account allowed Appellants to hide the fact that the company was bringing in millions of dollars more than it would from just the legitimate

---

[107] Five transactions moved $9.375 million in 2006, one transaction moved $1.5 million in 2009, and one transaction moved $1 million in 2010.

service fees. For the Government's argument to have any credence, the intent to conceal must have been to conceal from Stieglitz, who was the key financial person not involved in the money-laundering conspiracy. But Stieglitz's testimony directly contradicts the inference that the Government wishes to be drawn.

Stieglitz was well aware of all the money in the general operating account, how much money was paid to clients from that account, how much was left over, and how much was moved between the various accounts. Due in part to the variable service fee structure, he assumed that what was left in the general operating account after refunding clients was legitimate profit. Even if the presence of the fraud proceeds in the general operating accounts made the assumed profit larger than what the profit should be without the fraud schemes, Stieglitz remained unaware of the fraud schemes or the proceeds generated from them. Stieglitz was even involved in transferring money between accounts. For distributions to Volkes, both Stieglitz and an accountant were aware since they had to determine from which accounts to source the distribution funds and how to report them to the IRS. The evidence does not show that the transfers were designed, in whole or in part, to conceal the fraud proceeds since Stieglitz— the key financial person not involved in the money-laundering conspiracy—was aware of all the money in the company and was involved in the financial transactions, yet he remained unaware of the fraud schemes.

This also highlights that the financial transactions could not have been designed to conceal the source of the ill-gotten proceeds. The source of all money in the company was the pharmaceutical manufacturers. The legitimate and ill-gotten funds did not come from different sources. The only difference

44

is that the ill-gotten funds were supposed to go to clients and instead remained in the company's general operating account.

Appellants' conviction for concealment money laundering under 18 U.S.C. § 1956(a)(1)(B)(i) requires proof that financial transactions were "designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control" of the ill-gotten proceeds from the fraud schemes. Viewing the evidence in the light most favorable to the Government, there is not sufficient evidence to prove beyond a reasonable doubt that the alleged complex financial transactions—after the initial receipt of the "commingled" fraudulent and lawfully obtained funds—were designed for such concealment. We will therefore vacate the conviction for all Appellants as to Count 54 for conspiracy to launder money, vacate Appellants' sentences, and remand for resentencing.[108]

### E. The Government's Alleged Pattern of Misconduct

Appellants also argue that prosecutorial misconduct requires reversal of their convictions and either dismissal of the indictments or remand for a new trial. Appellants allege three forms of prosecutorial misconduct: (1) suppression of two favorable pieces of evidence in violation of *Brady*; (2) knowing misstatements by Agent Woodring to the grand jury; and (3)

---

[108] Appellants also argue that the indictment and jury instructions permitted the jury to convict them on a legally invalid theory of conspiracy to launder money. Since we vacate Appellants' convictions of conspiracy to launder money due to insufficient evidence, we need not consider this additional argument challenging the convictions.

45

display of an exhibit not in evidence to the jury.  We address each argument in turn.

## 1.  *Brady Violations*

This Court reviews a violation of *Brady v. Maryland*[109] *de novo* for conclusions of law, but applies a clearly erroneous standard to findings of fact.[110]  To establish a *Brady* violation, Appellants must show (1) that the Government suppressed evidence; (2) that the evidence was favorable to Appellants either because it was exculpatory or impeaching; and (3) that the evidence was material to guilt or punishment, meaning that there is a reasonable probability that, had the evidence been disclosed to Appellants, the result of the proceeding would have been different.[111]

Appellants claim that the Government suppressed two pieces of evidence.  The first is two pages of notes prepared by Agent Woodring, memorializing a phone call that she had with Vincent Valinotti, the DoD chief contracting officer for the 2007 contract.  The first page of these notes is dated March 12, 2010, and states that, although reverse distributors "will take indates," this "contract is silent" as to indates.[112]  The second page, dated December 17, 2010, states "nothing in contract re indates + not required," followed by a few illegible words.[113]

---

[109] 373 U.S. 83 (1963).

[110] *United States v. Georgiou*, 777 F.3d 125, 138 (3d Cir. 2015).

[111] *Id.* (quoting *Pelullo*, 399 F.3d at 209).

[112] App. 6125.

[113] App. 6126.

The second piece of evidence is a report of Agent Woodring's January 3, 2017 interview of Linda Magazu, the DoD contracting officer for the 2001 contract. In this report, Magazu opined that, "based on the statement of work [in the 2001 contract,] Guaranteed Returns was not obligated to store indated product because storing indated product was not specifically stated in the statement of work in the contract."[114] Magazu added that, "if Guaranteed Returns [held] indated product for the DoD, [it] could not return the product for credit and keep the credit. Guaranteed Returns could only give credit to the DoD and earn a service fee."[115]

Appellants concede that the Government produced the Magazu report on January 27, 2017, after the final pretrial conference and one business day before jury selection. The Valinotti notes were not disclosed until February 3, 2017, the Friday of the first week of trial and the Friday before the week when Valinotti was expected to testify.

"Where the government makes *Brady* evidence available during the course of a trial in such a way that a defendant is able effectively to use it, due process is not violated and *Brady* is not contravened."[116] Thus, assuming—without deciding—that these two pieces of evidence qualify as *Brady* material, we must consider whether Appellants were able to use the material and suffered prejudice from an untimely disclosure.[117] The Magazu interview report was

---

[114] App. 6256.

[115] App. 6256.

[116] *United States v. Johnson*, 816 F.2d 918, 924 (3d Cir. 1987).

[117] *United States v. Moreno*, 727 F.3d 255, 262 (3d Cir. 2013) (finding no violation where alleged *Brady* material was

produced five days before opening statements, and thirty-eight days before Agent Woodring testified. The Valinotti notes were produced four days before Valinotti testified.

Guaranteed Returns argues that the suppression of the Valinotti notes prevented it from discussing the notes in its opening statement, and that it would have used the notes to cross examine Robert Dooley, another Government witness. However, Guaranteed Returns's counsel mentioned in his opening that the 2001 DoD contract was silent on indates, and he made repeated reference to the notion that Guaranteed Returns's clients did not expect anything in return for indates. Guaranteed Returns also had the notes two days before Dooley testified,[118] and yet the company offers no argument as to how its cross examination of Dooley would have changed if it had received the evidence earlier. The company also claims that the Magazu interview report came too late to integrate the report into its pretrial strategy, but the company does not articulate how its strategy would have changed. In particular, the company does not argue that it would have called Magazu as a witness had the notes been disclosed earlier. Since Appellants have failed to demonstrate prejudice from the delayed disclosure of this evidence, they cannot succeed on their *Brady* arguments.[119]

produced at 7 p.m. the night before trial because defendant failed to establish prejudice).

[118] The Valinotti notes were produced two days before Dooley testified.

[119] Guaranteed Returns also argues that it would have moved to dismiss the indictments with these pieces of evidence, but again, it fails to articulate how this evidence would have permitted it to do so.

## 2. *Misrepresentations to Grand Jury and in Pursuit of Search Warrants*

Appellants also incorrectly claim that Agent Woodring lied to the grand jury and to a magistrate judge to obtain a search warrant. They argue that, once Agent Woodring spoke with Valinotti, she conclusively knew that the 2001 DoD contract did not "cover" indates, and therefore any statement that the contract did cover indates was a willful misrepresentation.

This mischaracterizes Agent Woodring's notes of her conversation. Valinotti told Agent Woodring that there was "nothing re indates"[120] in the 2001 DoD contract, meaning that the indates were not treated differently than any other pharmaceutical return under that contract. Valinotti also testified at trial that, although the 2001 DoD contract did not use the word "indates," the company treated indates like any other drug by either returning the indates to the manufacturer when they reached their expiration date or by destroying the indates if they were not returnable under the manufacturer's policy. Appellants point to nothing in the record to suggest that either Valinotti or Agent Woodring understood the contract differently. The argument that Agent Woodring lied or made a material misrepresentation every time she claimed that the 2001 contract covered indates is therefore baseless.

Appellants also claim that Agent Woodring made similar misrepresentations to the grand jury, but they concede that they are precluded from challenging their convictions

---

[120] App. 6126.

based on grand jury perjury.[121]  They only mention this in support of their argument on general prosecutorial misconduct, which, as noted below, does not succeed.

### 3.    *Display of an Exhibit not in Evidence*

Fallon also argues that a mistrial was warranted based on the Government's improper reference to an exhibit that was not in evidence.  During the Government's rebuttal summation, it displayed a one-page task list that listed Volkes as the "owner" and listed several tasks that he was apparently to complete.  The Government used the task list to connect the adjustment scheme to other testimony and evidence, suggesting that Appellants implemented the adjustment scheme to increase revenue and thereby enable Volkes to repay a loan that he took out to satisfy an unrelated Missouri judgment.

The District Court gave the jurors a curative instruction to disregard the task list, before other instructions in the case.[122]  After approximately ten hours of deliberation, the jurors sent a note indicating that they were hung as to Fallon on Counts 41–52 and 54.  The Court reminded them that the case had taken seven weeks to present, that they may reach

---

[121] Guaranteed Returns's Br. at 51; *United States v. Mechanik*, 475 U.S. 66, 73 (1986).

[122] The instruction stated that the exhibit was not in evidence and therefore that "aspect of [the Government's] argument is stricken, meaning that you must disregard the document itself and all arguments relating to it, and neither the document nor the related arguments may be considered by you in any way during your deliberations."  App. 5390.

50

different verdicts as to each defendant on each count, and that they should keep deliberating. The jury then asked to see a number of exhibits, including the task list not in evidence. The Court wrote back to the jury, noting that the task list was not in evidence, and referring them to the appropriate curative instruction, which they had with them in the jury room. At the request of Volkes's counsel, the Court also brought the jurors back to the courtroom to instruct them again that they should not consider the task list or any argument the Government made related to it. The jury then reached a verdict on all counts.

As we presume that jurors follow curative instructions, Appellants cannot prevail on this claim.[123] The District Court gave multiple instructions not to consider the task list, including a specific reminder after the jury requested it. This ensured that the jury was aware that they could not consider the task list. Appellants also concede that any error here is subject to harmless error analysis.[124] An error is harmless where the reviewing court possesses a sure conviction that the error did not prejudice the defendant.[125] We have such a conviction here. A Government witness had already connected

---

[123] *United States v. Franz*, 772 F.3d 134, 152 (3d Cir. 2014).

[124] *United States v. Molina-Guevara*, 96 F.3d 698, 703 (3d Cir. 1996)

[125] *United States v. Cunningham*, 694 F.3d 372, 392 (3d Cir. 2012) (quoting *United States v. Dispoz-O-Plastics, Inc.*, 172 F.3d 275, 286 (3d Cir. 1999)).

the Missouri judgment to the adjustment scheme, and the jury did not learn anything new from the task list.[126]

### 4. Cumulative Effect of Prosecutorial Misconduct

In order to have an indictment dismissed due to a course of prosecutorial misconduct, Appellants must demonstrate both prejudice from the misconduct and that there was no less severe means to remedy that prejudice.[127]  Appellants can do neither.  The only prejudice that they have identified was the Government's display of an exhibit not in evidence, which the District Court addressed through curative instructions and was harmless in any event.  Accordingly, Appellants have not shown that the indictment should be dismissed or that a new trial is warranted on the basis of alleged prosecutorial misconduct.

---

[126] In arguing for reversal on this basis, Appellants offer a different version of events.  Appellants contend that, after the jury was again instructed to disregard the task list, they provided a note to the Court indicating that they had reached a verdict and suggesting that they did so before hearing the curative instruction again.  Fallon's counsel raised this possibility with the District Court, but the Court clarified that, while it did receive an envelope when the jury entered to be reinstructed to disregard the task list, the envelope was empty.  There is no basis in the record for Appellants' assertions that the jury reached a verdict before the second curative instruction.

[127] *United States v. Wright*, 913 F.3d 364, 371 (3d Cir. 2019).

### F. The Restitution and Forfeiture Awards

Finally, Appellants challenge the District Court's restitution and forfeiture awards.

#### 1. Restitution Award

Our review of whether restitution is permitted by law is plenary, and we review any particular award for abuse of discretion.[128] We review factual findings as to the amount of loss for clear error.[129] To set aside an award, Appellants must demonstrate that the award is "completely devoid of a credible evidentiary basis or bears no rational relationship to the supporting data."[130]

At sentencing, the Government sought $157,896,446.94 in restitution for the indate scheme based on the "estimated return value" of the pharmaceuticals that Guaranteed Returns misdirected to itself, and $515,211.89 in restitution for the adjustment scheme. Appellants opposed using the estimated return value to calculate restitution in the indate scheme since the "actual return value" of the misdirected indates was readily available and reflected the proceeds that the company actually received. Appellants argued that the actual return value was $94,737,868.16. Appellants further argued that the actual return value should be reduced by approximately $13 million to reflect the reasonable fees that the defrauded clients would

---

[128] *United States v. Quillen*, 335 F.3d 219, 221 (3d Cir. 2003).

[129] *United States v. Vitillo*, 490 F.3d 314, 330 (3d Cir. 2007), *as amended* (Aug. 10, 2007).

[130] *Id.* (quoting *United States v. Haut*, 107 F.3d 213, 218 (3d Cir. 1997)).

have expected to pay for services in connection with the misdirected indates. Appellants therefore argued for a total restitution award of approximately $81 million for the indate scheme. The District Court accepted Appellants' calculation of the actual return value of the misdirected indates as the amount of restitution for the indate scheme. The Court ordered Appellants to pay two restitution awards: (1) $94,737,868.16 for the indate scheme, to be paid jointly and severally by Volkes and Guaranteed Returns; and (2) $515,221.89 for the adjustment scheme, to be paid jointly and severally by Volkes, Fallon, and Guaranteed Returns. Volkes and Guaranteed Returns were therefore responsible, jointly and severally, for a total of $95,253,090.05 in restitution.

Appellants now argue that the restitution award for the indate scheme was improper because the record did not support that *every single* client suffered a loss when Guaranteed Returns stole indate refunds properly due to them. This argument fails. A restitution award is only an abuse of discretion if it is devoid of a credible evidentiary basis or bears no rational relationship to the supporting data.[131] The District Court's use of Guaranteed Returns's records of the funds it actually received for the diverted indates satisfies this standard. The company argues that a low response rate to a victim impact survey somehow undermines this conclusion, but again, the District Court's use of the company's own records is a sufficient basis for the restitution calculation. Moreover, Appellants themselves proposed the $94 million restitution figure as the actual return value of the misdirected indates. Appellants have not shown that the District Court abused its

---

[131] *Vitillo*, 490 F.3d at 330.

discretion in imposing any of the restitution awards, so we will affirm.[132]

## 2. *Forfeiture Award*

Guaranteed Returns also raises a number of challenges to the District Court's forfeiture award. Since the forfeiture award is based on Appellants' convictions for conspiracy to launder money under Count 54, and since we will vacate the convictions as to Count 54 and vacate the sentences, so too must the forfeiture award be vacated. To the extent that a forfeiture award applies to the remaining convictions, we will remand to the District Court to recalculate any appropriate forfeiture award.[133]

## III. Conclusion

For the foregoing reasons, we will vacate the Appellants' convictions on Count 54 for the conspiracy to launder money, but we will affirm the remaining convictions.

---

[132] Since the restitution awards were not calculated based on the convictions for conspiracy to launder money, the awards do not need to be recalculated in light of our decision to vacate these convictions.

[133] The parties also agree that the District Court committed a computational error in calculating the forfeiture award because the Court did not adjust the award for the $6,313,128.10 in "direct credits" from the manufacturer that went directly to the accounts of Guaranteed Returns's clients. Guaranteed Returns Br. at 41; Gov't Br. at 174. To the extent that the District Court recalculates a forfeiture award absent the convictions for conspiracy to launder money, this amount in "direct credits" must be considered.

We also will vacate Appellants' sentences, other than the restitution award, and remand for resentencing, including a recalculation of the forfeiture award.

AFFIRMED in part; REVERSED in part; VACATED in part; and REMANDED for resentencing.